U.S. PADDING CORPORATION, A MICHIGAN CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 24008-81.          Filed January 20, 1987.

*Paul R. Jackman* and *Mark D. Solomon*, for the petitioner.

*Patrick J. Gray, Jr.*, for the respondent.

WHITAKER, *Judge*: On June 19, 1981, respondent issued a statutory notice of deficiency to petitioner for its fiscal years ended June 30, 1978, and June 30, 1979. Respondent determined deficiencies in the amounts of $49,066 and $108,309 for each year respectively, disallowing the consolidation by petitioner of its gross income and deductions with its wholly owned Canadian subsidiary. After concessions, the issue for decision is whether respondent erroneously determined that petitioner was ineligible to file a consolidated return.[1]

---

[1] On brief, petitioner raised further issues, to wit:

"In the event that the Respondent was correct in determining that Petitioner was not eligible to file a consolidated return with Trans Canada, whether the Respondent correctly recalculated

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. Petitioner U.S. Padding Corp. (U.S. Padding), is a Michigan corporation whose principal place of business at times pertinent hereto was Detroit, Michigan. At all times relevant herein, U.S. Padding was engaged in the business of producing high loft nonwoven fabrics and related nonwoven textiles for use in various industries. U.S. Padding's products were used primarily in the automotive industry. Its major customers included General Motors, Ford, Chrysler, and American Motors.

In 1977, the corporation began investigating other lines of products, fearing its present lines were insufficient to sustain the business. One such line was the manufacture of interfacings for the garment industry. Machinery for the production of interfacings was located at a Canadian company in St. Catharines, Ontario, which had been closed for 5 or 6 months. The interfacings product line looked promising, provided U.S. Padding could move into the market place quickly enough to regain some of the previous owners' customers.

The purchase of the assets at the St. Catharines location was subsequently negotiated, and sales agreements were conditioned on the Canadian Government's approval of the operation of a new business in Canada. To avoid delay, U.S. Padding formed the Canadian corporation now known as Trans Canada Non Woven, Ltd. (Trans Canada)[2] to operate the business. On November 4, 1977, an application on behalf of Trans Canada was submitted to the Foreign Investment Review Agency (agency) for approval to operate in Canada pursuant to the Foreign Investment Review Act

the Petitioner's allowable investment tax credit and allowable jobs credit?"

Petitioner did not present any evidence with respect to these issues, and in fact the parties stipulated that the amounts of allowable investment tax credits for the years ended June 30, 1978, and June 30, 1979, were $19,098 and $4,631 respectively. We presume these amounts have been conceded. Furthermore, with respect to the allowable job credits, respondent determined in the notice of deficiency that petitioner was allowed $3,500 for the year ended June 30, 1978, and $17,134 for the year ended June 30, 1979. We presume these amounts have been conceded since neither party has presented evidence or argument to the contrary.

[2]The corporation was originally incorporated as 83874 Canada Ltd. The articles of incorporation were subsequently amended changing the name to Trans Canada Non Woven, Ltd.

(act). By letter dated January 25, 1978, Trans Canada was notified by the agency that its application had been allowed.

For the fiscal years ended June 30, 1978, and June 30, 1979, Trans Canada operated at a loss. U.S. Padding consolidated its returns for those years with Trans Canada, pursuant to section 1504(d).[3] Respondent determined that U.S. Padding was ineligible to consolidate its returns with Trans Canada because Trans Canada was not formed solely for the purposes of complying with the laws of Canada as to title and operation of property. Respondent therefore disallowed those losses attributable to Trans Canada for each of the years in issue.

*Foreign Investment Laws of Canada*

The act, a statute of Canada which came into force in 1974 and 1975, evolved out of a concern in Canada about the high level of foreign investment in the Canadian economy and foreign control over large elements of the Canadian economy. The act provides for the review and assessment of acquisitions of control of Canadian businesses and of the establishment of new businesses in Canada by foreign persons or foreign-controlled enterprises. The agency, established under the act, was formed to advise and assist with the administration of the act.

Under the act, if a noneligible person[4] proposes the acquisition of control of a Canadian business enterprise or the establishment of a new business in Canada, then the noneligible person must file a notice (application for approval) with the agency. Upon receipt of the required notice, the agency sends the applicant a certificate acknowledging receipt. Agency review is then divided into two stages. In the first, the agency's compliance branch decides whether the application is complete and whether the business is one subject to review under the act. In the second stage, the agency's assessment branch collects relevant information from the applicant and makes a recommendation to the Minister of Industry, Trade, and Commerce on whether the application should be approved. The recommendation is

---

[3] All section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue.

[4] A noneligible person includes a corporation incorporated in or outside Canada that is controlled in fact by a foreign government or by nonresidents of Canada.

based on the agency's analysis of whether the acquisition of control or the establishment of a new business is likely to be of "significant benefit" to Canada, having taken into account the factors listed in the act for that purpose.[5] The actual determination of what is or is not of significant benefit to Canada under the statute is made by the Cabinet;[6] however the Cabinet acts on the recommendation received from the minister, which was typically drafted by the agency's assessment branch. The Cabinet is required to allow the acquisition or new business if it decides the investment is or is likely to be of significant benefit to Canada.

In practice, the assessment branch develops a preliminary view of the application after reviewing it and consulting with provinces significantly affected by the investment. The agency then consults with the applicant to explore any possible improvements in the applicant's plans that will enhance chances for approval. In some cases, the agency suggests that the applicant give an "undertaking" as to the manner in which a business will be owned and carried on.[7]

At the time U.S. Padding formed Trans Canada and sought approval to operate the business, neither the act nor any other Canadian statute or regulation required as a matter of law that the business incorporate in order to operate in Canada. However, in line with the general practice at that time, Canadian counsel advised incorpora-

---

[5]In assessing the likelihood of a "significant benefit" to Canada, the following factors are taken into account:

(a) the effect of the acquisition or establishment on the level and nature of economic activity in Canada, including, without limiting the generality of the foregoing, the effect on employment, on resource processing, on the utilization of parts, components and services produced in Canada, and on exports from Canada;

(b) the degree and significance of participation by Canadians in the business enterprise or new business and in any industry or industries in Canada of which the business enterprise or new business forms or would form a part;

(c) the effect of the acquisition or establishment on productivity, industrial efficiency, technological development, product innovation and product variety in Canada;

(d) the effect of the acquisition or establishment on competition within any industry or industries in Canada; and

(e) the compatibility of the acquisition or establishment with national industrial and economic policies, taking into consideration industrial and economic policy objectives enunciated by the government or legislature of any province likely to be significantly affected by the acquisition or establishment.

[6]Technically the Cabinet is the Governor-in-Council, which is a group composed of all the ministers and the Prime Minister.

[7]An undertaking is a written covenant given to the government of Canada upon which the Cabinet relies before giving an approval.

tion of Trans Canada in order to avoid delaying agency recommendation for approval. Ninety to 95 percent of businesses approved were approved as Canadian corporations. Members of the Canadian bar advised incorporation as a general rule under circumstances such as those presented because it was thought that the agency was more likely to recommend approval if the new enterprise was incorporated. Without incorporation, the business had little else in the way of benefits to offer. This advice was in large part based on experience in dealing with the agency. The practitioners believed that the minister placed a premium on incorporation since Canada benefits when a business is subject to Canadian judicial and regulatory authority. This belief stemmed from a statement in the corporate reorganization guidelines under the act which indicated that Canada benefits from incorporated enterprises. Although the reorganization guidelines are not applicable to the acquisition of a new business, and do not have the force and effect of law, practitioners nonetheless considered the statement as an indication of the minister's position, and uniformly recommended incorporation.

## OPINION

Foreign corporations generally do not qualify as includable corporations for purposes of filing consolidated returns. Sec. 1504(b)(3). However, under limited circumstances, a corporation organized under the laws of a contiguous foreign country may qualify. Sec. 1504(d). Sec. 1504 provides:

SEC. 1504(d). SUBSIDIARY FORMED TO COMPLY WITH FOREIGN LAW. [8]—In the case of a domestic corporation owning or controlling, directly or indirectly, 100 percent of the capital stock (exclusive of directors' qualifying shares) of a corporation organized under the laws of a contiguous foreign country and maintained solely for the purpose of complying with the laws of such country as to title and operation of property, such foreign corporation may, at the option of the domestic corporation, be treated for the purpose of this subtitle as a domestic corporation.

---

[8]We note that the title of this subsection is "Subsidiary *Formed* to comply with Foreign Law." (Emphasis added.) However the statute requires that the subsidiary be organized under the laws of a contiguous foreign country and *maintained* solely for the purpose of complying with laws of such country.

In the present case, in order to determine whether U.S. Padding properly consolidated its return we must decide whether Trans Canada was maintained solely for the purpose of complying with the laws of Canada as to title and operation of property.[9]

Respondent argues that Trans Canada was not within the ambit of section 1504(d) since U.S. Padding was unable to produce evidence of any law or regulation of Canada during the years at issue requiring Trans Canada to incorporate or be maintained as a corporation in order to operate in Canada. Respondent contends that the plain language of the statute contemplates either an explicit constitutional or statutory provision or an explicit rule or regulation prescribed by controlling authority which has binding force, requiring a parent corporation to operate its foreign branch as a corporation, and that none of these were in force during the years in question.

In contrast, U.S. Padding argues that Trans Canada is a subsidiary within the meaning of section 1504(d) because the agency would not have recommended approval to operate in Canada without incorporation, and such an administrative policy or practice implicitly requiring incorporation should be considered a "law as to title and operation of property" within section 1504(d).

Thus, in order to determine whether Trans Canada was maintained solely for the purpose of complying with the laws of Canada as to title and operation of property, we must first determine whether the "laws of such country" within section 1504(d) include administrative practices and policies, as U.S. Padding suggests. The issue has not been addressed by this Court heretofore.

Respondent's regulations in effect for the years in issue are silent as to any interpretation of section 1504(d). See sec. 1.1504-1, Income Tax Regs., which incorporates the definitions of sec. 1.1502-0 et seq., Income Tax Regs. Adopted in 1966,[10] the regulations were prospective only and reflected a complete revision of the consolidated return regulations. As a result of the revision, the pre-existing

---

[9]The parties do not dispute that Trans Canada is petitioner's wholly owned subsidiary and is organized under the laws of Canada, a contiguous foreign country.

[10]T.D. 6894, 1969-2 C.B. 362.

regulations were redesignated sections 1.1502-0A through 1.1502-51A, applicable only to years beginning before January 1, 1966. Sec. 1.1502-0, Income Tax Regs.

The pre-1966 regulations did address section 1504(d). Section 1.1502-2A(b)(3)(i), Income Tax Regs., mirrored the terms of the statute until 1968, when respondent amended the provision to provide the following:[11]

> (b) *Affiliated group.* * * *
> (3)(i) In the case of a domestic corporation owning or controlling, directly or indirectly, 100 percent of the capital stock (exclusive of directors' qualifying shares) of a corporation organized under the laws of Canada or of Mexico and maintained solely for the purpose of complying with the laws of such country as to title and operation of property, such foreign corporation may, at the option of the domestic corporation, be treated for income tax purposes as a domestic corporation. *For purposes of this subparagraph, the term "laws of such country" includes the laws of any province, state, or other political subdivision, and the term "laws" includes, in addition to explicit statutory or constitutional provisions, any existing legislative practice or policy.* For example, if the laws of Canada permit the ownership or operation of specified property, such as a railroad, only by a person granted a special legislative authorization, and it is established that there is an implicit legislative policy that such authorization would be granted only to a corporation organized under the laws of such country, then a corporation organized under the laws of Canada to own or operate such property will be considered maintained solely for the purpose of complying with the laws of such country as to title and operation of property. If, however, Canada has a general statutory prohibition against the ownership or operation of specified property by a United States corporation, but as a matter of established practice special legislative action can be obtained for the ownership or operation of specified property by a United States corporation, then a corporation organized under the laws of Canada to own or operate such property will not be considered maintained solely for the purpose of complying with the laws of such country as to title and operation of property. [Emphasis added.]

It appears as though respondent adopted, at that time, a position identical to that urged by U.S. Padding in the present case.[12] We do note, however, that in all material respects the language of section 1504(d) has been unchanged since adoption of the 1954 Code. However, respondent limited the application of the amended provision to years prior to 1966. Without an explanation for the limited

[11]T.D. 6988, 1969-1 C.B. 216.

[12]Neither party addressed the application or significance of this regulation on brief.

application, and without a comparable provision in the post-1966 regulations, we are unable to attach any significance to respondent's regulations and instead turn to the statute's legislative history and other relevant evidence.

Our function in the interpretation of statutes is to construe the language so as to give effect to the intent of Congress. *J.C. Penney Co. v. Commissioner*, 37 T.C. 1013, 1019 (1962), affd. 312 F.2d 65 (2d Cir. 1962). It is well established that we may look to the legislative history of a statute where the statute is ambiguous. In addition, we may seek out any reliable evidence as to legislative purpose even where the statutory language is clear. *United States v. American Trucking Associations*, 310 U.S. 534, 543-544 (1940); *Huntsberry v. Commissioner*, 83 T.C. 742, 747-748 (1984); *J.C. Penney Co. v. Commissioner, supra*. As the Supreme Court stated in *Ozawa v. United States*, 260 U.S. 178, 194 (1922):

> It is the duty of the Court to give effect to the intent of Congress. Primarily this intent is ascertained by giving the words their natural significance, but if this leads to an unreasonable result plainly at variance with the policy of the legislation as a whole, we must examine the matter further. We may then look to the reason of the enactment and inquire into its antecedent history and give it effect in accordance with its decision and purpose, sacrificing, if necessary, the literal meaning in order that the purpose may not fail. * * *

Section 1504(d) was first enacted as section 141(h) of the Revenue Act of 1928, Pub. L. 562, 70th Cong., 1st Sess., 45 Stat. 832 (1928).[13] Section 141(h) of the 1928 act was introduced as an amendment on the Senate floor and was passed without discussion. The Senate, House, and Conference reports are silent as to the reasons for the inclusion of section 141(h).[14] However, we are convinced that the provision originated in a statement of John E. Walker at hearings before the Senate Finance Committee on what

---

[13]Sec. 141(h) became 141(g) in 1942, pursuant to sec. 101 of the Revenue Act of 1942, Pub. L. 753, 77th Cong., 1st Sess. (1942), 56 Stat. 802. This amendment did not change the substance of the section. Sec. 141(g) then became the current sec. 1504(d) when the Internal Revenue Code was revised in 1954. Pub. L. 591, 83d Cong., 1st Sess., 68A Stat. 370 (1954). The section has remained substantially unchanged throughout its existence.

[14]H. Rept. 2, 70th Cong., 1st Sess. (1928), 1939-1 C.B. (Part 2) 384; S. Rept. 960, 70th Cong., 1st Sess. (1928), 1939-1 C.B. (Part 2) 409 ; Conf. Rept. 1882, 70th Cong., 1st Sess. (1928), 1939-1 C.B. (Part 2) 444.

eventually became the Revenue Act of 1928.[15] At those hearings, Mr. Walker appeared on behalf of the United States Graphite Co. of Saginaw, Michigan, and the Green-Cananea Copper Co. of New York City.[16] Mr. Walker expressed his clients' concerns about a proposed amendment to the then existing section 240(f), which would have limited the consolidation of the domestic and foreign corporate returns to those situations in which consolidated accounts would have achieved a true reflection of income. In the past, domestic corporations and foreign subsidiaries had been able to file consolidated returns whenever the foreign subsidiary was willing to report all of its income for U.S. income tax purposes and be treated exactly as a domestic corporation. Mr. Walker was concerned that foreign subsidiaries who desired to return all of their income to the United States would continue to be treated exactly as domestic corporations only when the Commissioner deemed it necessary to do so. Mr. Walker therefore proposed a solution that would treat foreign subsidiaries the same as their domestic subsidiary counterparts.

The following is an excerpt from the hearing in which the amendment proposed by Mr. Walker was discussed:

MR. WALKER. That is true. So far as the United States Graphite Co. and the Green-Cananea Co. are concerned, all they want to do is to be put on an exact basis with other American companies, their competitors. They are perfectly willing to return every cent of income to this country, to which the United States ought not to object, *and all they are asking for is to be put on the same basis as other domestic companies, that are not operating with foreign subsidiaries.*

SENATOR REED. What is your suggestion?

MR. WALKER. Our suggestion is to add a new subdivision at the end of section 45, as follows:

In case of a domestic corporation owning or controlling directly or indirectly 100 per centum of the capital stock of a foreign corporation (exclusive of directors' qualifying shares) maintained solely for the purpose of complying with the laws of such foreign country as to title

---

[15]See H.R. 1 (Revenue Act of 1928) at 227, 231-237.

[16]United States Graphite Co. organized a foreign subsidiary to file a claim to its own property after the Mexican constitution in 1917 gave authority to Mexican corporations to take property. The foreign subsidiary claimed its own property to prevent the property's being taken without compensation.

Green-Cananea Co. formed a foreign subsidiary in Mexico in order to operate in a restricted zone. Under the Mexican constitution a Mexican corporation was required to be organized to remain in control of the company property.

and operation of property, such domestic corporation may make return of income with the same credits, deductions, and allowances as if the properties of such foreign corporation were owned and operated directly by such domestic corporation.

SENATOR REED. That would put the Treasury Department into a study of the foreign laws to see whether it was necessary to maintain that subsidiary.

MR. WALKER. So far as Mexico is concerned.

SENATOR REED. I know; but this would apply to companies all over the world.

MR. WALKER: I do not see any objection to that. The United States Government certainly does not lose anything, so long as they are willing to return all the income in this country.

SENATOR REED. But the section as you have drawn it there would require it to be established as a preliminary that the laws of that foreign country required the organization of the subsidiary in order to operate or to hold title there.

MR. WALKER. I do not know of any country other than Mexico that imposes these restrictions; and, in the case of any company that found it to its advantage to follow this policy, there would be certainly little trouble on the part of such company in furnishing the Treasury with the necessary information to reach that determination.

SENATOR KING. Let me ask this question. I do not know that I quite follow all the implications of that proposed amendment. More and more American capitalists—and I am not complaining of that—are forming corporations to do business in foreign countries—in China, for instance, and some in South Africa and Mexico.

THE CHAIRMAN. All over the world?

SENATOR KING. Yes; all over the world. Do you propose that if these same companies have business activities in the United States with a parent company, or a subsidiary corporation, they may mass or compound their foreign corporations and their domestic corporations with those formed in the United States for the purpose of getting all the benefits of depletion, etc., for the mines in Mexico, or their mines in South Africa, or their mines in Australia, and all the benefits of our act?

MR. WALKER. As this is drawn, Senator, we have drawn it in the most limited manner we know how. *We have limited it only to companies which, in order to operate in a foreign country, have to organize a foreign corporation to so operate.* So far as I know Mexico is the only country that has such a requirement.[17]

[Emphasis added.]

Because section 141(h) as originally adopted was nearly identical to Mr. Walker's proposed subdivision, we have concluded that Congress enacted the statute with Mr.

---

[17]We note that Senator King's concern about worldwide foreign subsidiaries was apparently remedied through the use of the language restricting application of sec. 1504(d) to subsidiaries organized in contiguous foreign countries.

Walker's concerns in mind. As the excerpt from the hearing reflects, Mr. Walker sought a provision which would put the corporations he represented on equal footing with other domestic corporations who were entitled to consolidate their returns with their subsidiaries. He limited the provision, however, to companies which, in order to operate in the foreign country, found it necessary to organize a foreign corporation.

We see nothing in the hearings or legislative history that indicates that the requirement to operate a foreign subsidiary must arise solely from a statutory or constitutional provision as respondent suggests. While the companies Mr. Walker represented were affected by the Mexican constitution, we do not think Congress intended to limit the statute to constitutional provisions or statutes. Congress' concern was to alleviate the inequalities faced by domestic corporations which found it necessary to form foreign subsidiaries in order to operate. A liberalization of the law in petitioner's favor should not be narrowly construed. *Helvering v. Bliss*, 293 U.S. 144 (1954). This was implicitly recognized by the Seventh Circuit in the only case to date interpreting section 1504(d). See *Booth Fisheries Co., Ohio v. Commissioner*, 84 F.2d 49 (7th Cir. 1936). In *Booth Fisheries* the taxpayers alleged that the Commissioner erred in failing to allow them certain losses sustained by their Canadian subsidiaries. At trial, the taxpayers offered as evidence of their reasons for incorporation, the Companies Act of Canada of 1927. The Seventh Circuit found that the act was not expressly prohibitory, but that by inference it raised a barrier to foreign corporations not complying therewith. That, coupled with the testimony of the general manager that the purpose for which the corporation was organized in Canada was to conform to Canadian requirements to make it possible to operate there, convinced the Court, in the absence of any showing by respondent to the contrary, that the Canadian subsidiaries were with the terms of section 141(h) (now sec. 1504(d)).

Based on the foregoing, we interpret "laws of such country" to include not only explicit constitutional or statutory provisions and explicit rules and regulations prescribed by controlling authorities, but also any existing

practice or policy of such foreign country which results in a domestic corporation finding it necessary to maintain its foreign business and properties as a foreign corporation in order to operate in that country.

Furthermore, such an administrative practice or policy existed in Canada during the years in issue. While it is evident that in 1977 there was no statutory provision which required a U.S. corporation intending to start a new business in Canada to operate through a Canadian subsidiary, that was the almost universal practice. Approximately 90 to 95 percent of new businesses approved under the act were approved as Canadian corporations. All of the experts, including respondent's, testified that they would have advised Trans Canada to incorporate.[18] This evidence certainly establishes a practice in Canada which was favored, if not required, by those approving foreign investments in the country at the time. Based on these facts, we conclude that it was necessary for Trans Canada to incorporate in order to operate in Canada. See *Booth Fisheries Co., Ohio v. Commissioner, supra.* We therefore hold that Trans Canada is a foreign subsidiary within section 1504(d) and that U.S. Padding properly consolidated its returns with Trans Canada during the years in issue.

*Decision will be entered for the petitioner.*

---

[18]Respondent's expert testified that incorporation was advised in part to avoid the Canadian branch office tax. However there was no evidence that the branch office tax was taken into account by U.S. Padding. Furthermore, respondent's expert testified that he would have advised Trans Canada to incorporate to avoid "questions [from the agency] as to why not."