JOHN HIRASUNA AND CLAUDIA HIRASUNA, PETITIONERS
*v.* COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

HARRY H. HATASAKA AND SADAKO M. HATASAKA,
PETITIONERS *v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT

Docket Nos. 27047-83, 16242-85.     Filed December 28, 1987.

*Montie S. Day,* for the petitioners.
*Erik P. Doerring,* for the respondent.

## OPINION

PARR, *Judge:* These consolidated cases are before the Court on petitioners' motion for summary judgment filed on December 18, 1986, and respondent's cross-motion for partial summary judgment filed on March 9, 1987. Both petitioners' motion and respondent's cross-motion included a memorandum of law, affidavits, and exhibits. Petitioners filed a memorandum in reply to respondent's cross-motion on May 12, 1987.

In a notice of deficiency dated July 11, 1983, respondent determined deficiencies in John and Claudia Hirasuna's Federal income tax for 1980 and 1981 as follows:

| Taxable year | Amount |
|---|---|
| 1980............................................. | $5,994 |
| 1981............................................. | 7,600 |

In a notice of deficiency dated May 9, 1985, respondent determined a deficiency in Harry and Sadako Hatasaka's 1983 Federal income tax as follows:

| | Additions to tax | | |
|---|---|---|---|
| Deficiency | Sec. 6653(a)(1)[1] | Sec. 6653(a)(2) | Sec. 6661 |
| $5,269 | $263 | ([1]) | $527 |

[1]50 percent of interest due on an underpayment of $5,269.

The issue for decision is whether petitioners were involved in a farming "enterprise" from which more than 35 percent of the losses were "allocable" to them, under the terms of section 464(c)(1)(B), relating to farming syndicates.

## FINDINGS OF FACT

During the years at issue, petitioners' professional salaries were their primary source of income. John Hirasuna was a practicing dentist and Claudia Hirasuna was a dental technician. Harry Hatasaka was an orthodontist and Sadako Hatasaka was a housewife.

The issues in these cases arose out of petitioners' contracts with Pacific Agricultural Services, Inc. (Pac Ag). Pac Ag operated in San Joaquin Valley, California, as an "agri-business enterprise," buying, developing, and farming land.

Pac Ag was a successor to two smaller companies, a citrus tree nursery which principals of Pac Ag formed in the late 1950's and a farm management company which these principals formed in 1962. The two companies combined and, in the early 1970's, were acquired by a large firm specializing in agricultural development and farming. Pac Ag principals reacquired the businesses in 1974 and established Pac Ag.

During and prior to the years at issue, Pac Ag operated in conjunction with its three subsidiaries: Agricultural Properties Management, Inc.; Farm Management Consult-

---

[1]All section references are to the Internal Revenue Code of 1954 as amended and as in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.

ants, Inc.; and Pacific Real Estate, Inc. These subsidiaries were formed or acquired to meet "the increasingly diversified needs of the agricultural and investor communities."

Together with these subsidiaries, Pac Ag operated various divisions encompassing all aspects of the farming business. The real estate brokerage division bought and sold agricultural properties. Both Pac Ag and its subsidiary, Pacific Real Estate, Inc., were licensed as California real estate brokers through two of the principals of Pac Ag. The land development division developed raw land for use in farming. The nursery division raised trees for planting on the farms. The irrigation systems division designed and installed irrigation systems and the farming operations division farmed almost every type of crop commercially grown in the San Joaquin Valley.

During or prior to the years at issue, Pac Ag farmed approximately 12,000 acres of crops, employing about 110 full-time employees and about 150 pieces of farming equipment. The total value of the farm land under its management exceeded 50 million dollars.

Both the farm management division and the real estate brokerage division used computers in their operations. The farm management division used computers to prepare annual budgets for the ranches it managed. The real estate brokerage division designed a financial simulation model which provided clients with information relating to the real estate (e.g., depreciation and debt amortization schedules and schedules showing average return on investment) to assist them in purchase and sale decisions.

The facts of the cases before us specifically concern land included within an area in Madera County, California, known as Haley Ranch. Between 1979 and 1982, Pac Ag purchased approximately 2,500 acres in the Haley Ranch area and offered parcels for lease with an option to buy, or for sale, retaining a security interest through a deed of trust. Both sets of petitioners in these cases purchased or leased property from Pac Ag within the Haley Ranch area.

On September 15, 1979, John Hirasuna entered into a lease agreement (agricultural lease or lease) with Pac Ag which gave him an option to purchase an undivided 25-percent interest in the 80-acre parcel which was the

subject of the lease. The term of the lease was 1 year beginning September 15, 1979, with an option to renew for an additional year.

The agricultural lease named Pac Ag as lessor and Hirasuna as lessee. As lessor, Pac Ag agreed to prepare the leased property for planting and to plant 50 percent of the property in fig trees, 25 percent in pistachio trees, and 25 percent in jojobas. Under the terms of the lease, Hirasuna agreed to pay $4,800 for these services and $17,000 for his proportionate share of the irrigation system installed on the property.

The agricultural lease provided for a first year rent of $2,000 and required Hirasuna to pay his pro rata share of real property taxes. The lease also provided that "In and for additional consideration, Lessee additionally agrees to execute the Farm Management Agreement and Care and Growing Agreement."

The care and growing agreement (growing agreement) was deemed to have commenced on August 16, 1979, between Pac Ag as "grower" and John and Claudia Hirasuna (Hirasunas) as "owner." The growing agreement governed the terms under which Pac Ag would grow the seedlings to be planted on the leased property. As grower, Pac Ag agreed "subject to the direction of the owner," to provide a nursery and necessary equipment as well as labor, water, fertilizer, and insecticide. Additionally, Pac Ag agreed to take charge of overall nursery operations and perform all acts necessary to assure proper growth of the seedlings.

The growing agreement provided that the Hirasunas would accept the risk for loss or damage to the seedlings caused by "acts of God," including: "adverse weather, quarantine, disease, floods, labor or water shortages or other *force majeure.*"

Pac Ag expressly agreed, "to employ all appropriate and proper cultural practices and normally accepted nursery practices for the proper growing, maintenance and care of the seedlings and trees while in the nursery." Pac Ag further agreed that as grower, it:

shall be responsible for and shall replace any Seedlings or Trees at his sole cost and expense, which have been damaged by any negligence of Grower in growing, maintaining or caring for the Seedlings and Trees

while in the nursery, and any inherently poor or weak trees which are not thrifty or healthy in appearance, due to * * * [Pac Ag's failure to employ proper growing practices].

Pac Ag agreed to deliver "healthy, vigorous trees or plants, each of which shall be thrifty in appearance, meets standards acceptable to the industry, and is fit and ready for transplanting to the land directed by the Owner." The growing agreement provided for a total fee of $6,558.

The farm management agreement (management agreement) between the Hirasunas as "grower" and Pac Ag as "farm manager" was executed on December 6, 1979. The term of the management agreement was from January 1, 1980, to December 31, 1983. The management agreement contained a recital that:

Farm Manager is an independent contractor and is engaged in the business of conducting agricultural and farming operations necessary to farm tree crops in a diligent, competent and farm-like manner * * *

As farm manager, Pac Ag's duties were to "carry out all agricultural and farming operations on the property as directed by Grower, including but not limited to cultivation, fumigation, weed and pest control and care and maintenance of the crops and trees." Additionally, Pac Ag was responsible for maintaining the irrigation system and for performing "such other and further duties as Farm Manager, in the exercise of due diligence, may deem necessary or desirable to effectuate an efficient, economical and profitable operation of property."

The management agreement provided for a management fee, payable quarterly in amounts ranging between $1,375 and $1,600. This fee covered the cost of farm management except for extraordinary repairs of the irrigation system and tree pollination, tree replacement, and crop harvesting.

The management agreement also contained the following provisions relating to insurance, indemnification, and risk of loss:

5. INSURANCE: Farm Manager shall maintain:
    (a) public liability insurance in such amounts as Farm Manager deems reasonable; such policy to name Grower as additional insured, evidenced by a proper certificate with not less than ten (10) days notice of cancellation.

(b) Farm Manager shall also carry such Workmen's Compensation insurance coverage as is reasonably required by its agricultural and farming operations on the property.

6. INDEMNITY: Farm Manager shall indemnify and hold Grower free and harmless for any personal injuries or property damage to Farm Manager's employees or to third persons which may occur by reason of Farm Manager's acts or omissions; such indemnification shall include reasonable attorney fees.

7. FORCE MAJEURE: Farm Manager assumes no liability for injury to or destruction of any trees, crops, or improvements on the property resulting from acts of God.

Harry Hatasaka (Hatasaka) entered into an agricultural lease, a care and growing agreement, and a farm management agreement with Pac Ag. which were essentially identical to, and bore the dates of, those entered into between the Hirasunas and Pac Ag.

Both sets of petitioners have alleged that they exercised their options to purchase a 25-percent undivided interest in the 80-acre parcels which were the subject of the leases, and that they later acquired a fee simple interest in 20 acres of these parcels. Petitioners do not specify in what year these purchases took place nor have they presented any documentation of the purchases. For purposes of these motions, respondent concedes that petitioners owned or leased the property during the years at issue.

On Schedule F of their 1980 and 1981 returns, the Hirasunas deducted the following amounts as farm expenses:

### 1980

| | |
|---|---:|
| Interest | $124 |
| Rent of farm | 10,625 |
| Taxes | 430 |
| Insurance | 209 |
| Tree care and growing | 5,850 |
| Professional services | 1,000 |
| Auto expenses | 240 |
| Total | 18,478 |

### 1981

| | |
|---|---:|
| Interest | $124 |
| Rent of farm | 6,088 |
| Taxes | 202 |
| Tree care and growing | 6,400 |
| Irrigation | 6,431 |

*1980*

| | |
|---|---|
| Professional expense............................. | $300 |
| Total ........................................ | 19,545 |

In the notice of deficiency for 1980 and 1981, respondent determined that the following expenses were nondeductible capital expenditures under section 278:

| | *1980* | *1981* |
|---|---|---|
| Rent of farm | $10,625 | $6,088 |
| Tree care and growing | 5,850 | 6,400 |
| Irrigation | - - - | 6,431 |
| Total | 16,475 | 18,919 |

On Schedule F of their 1983 return, the Hatasakas deducted the following amounts as farm expenses:

*1983*

| | |
|---|---|
| Interest......................................... | $1,749 |
| Depreciation .................................... | 104 |
| Professional services............................ | 740 |
| Farm care and cultural .......................... | 5,188 |
| Irrigation lease................................. | 4,154 |
| | 11,935 |

In the notice of deficiency for 1983, respondent disallowed the entire $11,935 as a nondeductible capital expenditure under section 278.

OPINION

The Court will grant a motion for summary judgment when the evidence shows "that there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law." Rule 121(b); *Jacklin v. Commissioner,* 79 T.C. 340, 344 (1982). We must deny the motion if there is any reasonable doubt as to the facts at issue. *Gulfstream Land & Development v. Commissioner,* 71 T.C. 587, 596 (1979).

The burden is on the moving party to show that the facts of the case are not at issue. *Adickes v. Kress & Co.,* 398 U.S. 144, 158-159 (1970); *Vallone v. Commissioner,* 88 T.C. 794, 801 (1987). Accordingly, the facts must be viewed in the light most favorable to the party opposing the motion. *Jacklin v. Commissioner, supra* at 344; *Espinoza v. Commissioner,* 78 T.C. 412, 416 (1982).

In their motion for summary judgment, petitioners seek an adjudication that they are not members of a farming syndicate as defined in section 464(c), and that section 278 does not require them to capitalize certain farm expenses. In his motion for partial summary judgment, respondent requests us to find that petitioners were involved in an enterprise which allocated more than 35 percent of the losses to them, as those terms are used in section 464(c)(1)(B).

Section 278(b) provides:

SEC. 278(b). FARMING SYNDICATES.—Except as provided in subsection (c), in the case of any farming syndicate (as defined in section 464(c)) engaged in planting, cultivating, maintaining, or developing a grove, orchard, or vineyard in which fruit or nuts are grown, any amount—

(1) which would be allowable as a deduction but for the provisions of this subsection,

(2) which is attributable to the planting, maintenance, or development of such grove, orchard, or vineyard, and

(3) which is incurred in a taxable year before the first taxable year in which such grove, orchard, or vineyard bears a crop or yield in commercial quantities, shall be charged to capital account.

Section 464(c)(1)(B)[2] defines a farming syndicate as—

(B) a partnership or any other enterprise other than a corporation which is not an S corporation engaged in the trade or business of farming, if more than 35 percent of the losses during any period are allocable to limited partners or limited entrepreneurs.

The term "limited entrepreneur" is defined in section 464(e)(2) as a person who:

(A) has an interest in an enterprise other than as a limited partner, and

(B) does not actively participate in the management of such enterprise.

Section 464(c)(2) treats certain interests attributable to active management as interests not held by limited partners or limited entrepreneurs.

Both parties have stated that their motions do not reach the issue of whether petitioners are "limited entrepreneurs." For purposes of petitioners' motion and respondent's cross-

---

[2]For purposes of this motion, respondent does not argue that petitioners are members of a farming syndicate as defined in sec. 464(c)(1)(A). That section pertains to partnerships or other enterprises other than C corporations, in which an interest has been offered for sale in an offering required to be registered with a Federal or State agency.

motion, the limited issue for decision is whether petitioners were members of an "enterprise" engaged in the trade or business of farming as defined in section 464(c)(1)(B) and, if so, whether more than 35 percent of the losses from the enterprise were "allocable" to them.

It is respondent's position that the Hirasunas and the Hatasakas were involved in separate enterprises with Pac Ag, and that Pac Ag allocated 100 percent of the expenses from these enterprises to petitioners, which gave rise to petitioners' claimed tax losses.[3] Petitioners contend that they did not enter into any agreement to allocate expenses or losses with any other lessors or purchasers of farm property, and that the agreements between themselves and Pac Ag did not create a "farming syndicate" as defined in section 464(c).

Both petitioners and respondent refer to the legislative history of section 278(b) and section 464(c) to support their positions. We may examine the legislative history of a statute even when it is clear on its face. *U.S. Padding Corp. v. Commissioner,* 88 T.C. 177, 184 (1987). But we will not construe a statute so as to override the plain meaning of the words, without unambiguous evidence of legislative purpose. *Huntsberry v. Commissioner,* 83 T.C. 742, 747-748 (1984).

Section 278 was originally added to the Code by section 216(a), Pub. L. 91-172, 83 Stat. 487, 573 (1969). As amended by section 1, Pub. L. 91-680, 84 Stat. 2064 (1971), the statute required capitalization of certain expenses from the planting or cultivation of citrus and almond groves.

Section 207 of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1525, 1536, added new section 464 to the Code and amended section 278 by inserting a new subsection (b), effective for taxable years beginning after December 31, 1975.

The Joint Committee explanation of the Tax Reform Act of 1976 indicates that in enacting section 464 and section 278(b) Congress was concerned that high bracket taxpayers

---

[3] Neither party has contended that the "enterprise" could be viewed as between Pac Ag and all of its clients or between Pac Ag and the owner-lessees of the Haley Ranch. We thus do not consider these possibilities.

who were not full-time farmers were using tax benefits available to farmers to shelter income:

The special tax rules available to farmers have been utilized by both full-time farmers and by high-bracket taxpayers who participated in farming as a sideline. Part-time farmers have been entitled to use the special farm rules even if they were absentee owners who paid agents to operate their farming activities and regarded their own participation (such as being limited partners in a nationwide syndicate) as a completely passive investment. [Staff of J. Comm. on Taxation, General Explanation of the Tax Reform Act of 1976, at 40, 1976-3 C.B. (Vol. 2) at 52 (hereinafter J. Comm. Explanation).]

Special farm tax rules allowed farmers to deduct farm expenses prior to the year in which the income associated with those expenses was earned, rather than capitalizing these expenses. For example, farmers could currently deduct the cost associated with the development of an orchard or vineyard (e.g., spraying, fertilizing, cultivating) prior to its first crop-bearing year. See sec. 1.162-12(a), Income Tax Regs.; *Maple v. Commissioner*, T.C. Memo. 1968-194, affd. 440 F.2d 1055 (9th Cir. 1971). Farm investors could use development cost to offset income from non-farm sources. J. Comm. Explanation, 1976-3 C.B. (Vol. 2) at 52-53.

Congress was concerned with the growing number of publicly syndicated investments in agriculture:

Farm tax benefits were effectively packaged and sold to high-bracket taxpayers through limited partnerships (and management contracts) for investments in cattle feeding and breeding, tree crops, vegetable and other field crops, vineyards, dairy cows, fish, chickens and egg production. [J. Comm. Explanation, 1976-3 C.B. (Vol. 2) at 55.]

In enacting section 278(b) and section 464,

Congress believed that the special farm tax rules should be continued for most farmers who are actively engaged in farm operations, but that such special farm tax rules should be severely curtailed for farming syndicates in which a substantial portion of the interest is held by taxpayers who are motivated, in very large part, by a desire to shelter other income, rather than by a desire to make a profit in the particular farming operation.

Congress also believed that reducing tax incentives for high-bracket taxpayers who invest in syndicated farming operations will improve the competitive position of full-time farmers who must look to the income generated from farm operations for all or most of the return on their investment in farm operations.

[J. Comm. Explanation, 1976-3 C.B. (Vol. 2) at 58.]

From the legislative history of section 278(b) and section 464(c) and the language of the statutes, we conclude that through agreements with Pac Ag, petitioners acquired interests in enterprises, as defined in section 464(c)(1)(B), which allocated to them 100 percent of expenses and thus effectively 100 percent of losses.

Congress intended to give the term "enterprise" a broad definition to encompass many types of business organizations "such as general partnerships, sole proprietorships involving agency relationships created by management contracts, trusts, and interests in subchapter S corporations." J. Comm. Explanation, 1976-3 C.B. (Vol. 2) at 58. As noted, the legislative history of section 464 discusses the use of management contracts as a means of transferring farm tax benefits. J. Comm. Explanation, 1976-3 C.B. (Vol. 2) at 55. Management contracts formed the relationship between petitioners and Pac Ag. Through their agricultural leases, growing agreements, and management agreements, petitioners delegated authority to Pac Ag to conduct all farming operations relating to the development of the crop-producing plants. These agreements created an "enterprise" between the Hirasunas and Pac Ag, and between the Hatasakas and Pac Ag, within the meaning of section 464(c)(1)(B).

The term "allocable" as used in this section must be defined to coordinate with the broad definition of enterprise. Although partnership agreements expressly allocate losses, the agreements forming other business enterprises, such as management contracts, may not. We must consider the effect of the agreements in this case, as well as their express terms, to determine whether, and to what extent, losses were allocable to petitioners.

The agreements between Pac Ag and petitioners required petitioners to pay all of the expenses associated with the farming activities. Accordingly, to the extent allowable, these expenses were deductible by petitioners. Because no income was generated from these activities during the years at issue, total expenses represented total losses. Thus, 100 percent of the losses from the farming enterprises were

effectively allocated to petitioners through the agreements they entered into with Pac Ag.

Petitioners contend that section 278 and section 464 were intended only to limit deductions for artificial losses. They claim that the expenses they deducted reflect actual economic losses to which these statutes do not apply. Petitioners note that the farming syndicate provisions of H.R. 10612 were first drafted as part of a set of provisions designed to limit artificial losses. See H. Rept. 94-658, at 39 (1976), 1976-3 C.B. (Vol. 2) at 695, 731. The House report accompanying H.R. 10612 defines an "artificial or purely tax loss" to include deductions for expenses taken prior to the year the income associated with those expenses is earned. H. Rept. 94-658, *supra* at 39, 1976-3 C.B. (Vol. 2) at 731. Even if petitioners paid the expenses claimed, petitioners' losses are "artificial" because of the mismatching of income and expenses.

Petitioners also contend that they are not members of a farming syndicate because they did not have limited liability for farm losses. Petitioners cite the following language from a report accompanying the Senate version of H.R. 10612:

the fact that an investor delegates authority to an agent or hires an independent contractor will not in itself render the investor subject to the farming syndicate rules unless there is limited risk. * * * [S. Rept. 94-938, at 60 (1976), 1976-3 C.B. (Vol. 3) at 98.]

Section 464 contains no express requirement that members of a farming syndicate have limited liability for farm losses. The legislative history of section 464 does refer to limited liability but with varying degreees of emphasis.

As originally drafted, H.R. 10612 defined three categories of farming syndicates. The third category included "any other enterprise engaged in farming if * * * the allocation of losses in the enterprise is similar to an allocation of more than 50 percent of the losses to limited partners." H. Rept. 94-658, at 47, 1976-3 C.B. (Vol. 2) at 739. The House report provided that a person was similar to a limited partner if he did not actively participate in the management of the farm. Active participation was to be determined by looking at all the facts and circumstances, including whether the person

had limited liability for farm losses. H. Rept. 94-658, *supra* at 47, 1976-3 C.B. (Vol. 2) at 739 n. 18.

The Senate amendment to H.R. 10612, modified—

the House bill to provide that, in defining this third category of farming syndicate, the focus is to be on the fact that a person or persons is involved whose liability is limited to his investment in the farm enterprise rather than the degree of active participation of the person (or persons) in the operation or management of the enterprise. [S. Rept. 94-938, *supra* at 60, 1976-3 C.B. (Vol. 3) at 98.]

Whether a person had limited risk was under the Senate provision a facts and circumstances question.[4]

The Senate amendment was revised by Conference agreement. The term "persons with limited risk" was replaced with "limited entrepreneur" and the focus of the provision was shifted back to active participation:

In general, a limited enterpreneur means a person who has an interest in an enterprise other than a partnership and who does not actively participate in the management of the enterprise.

The determination of whether a person actively participates in the operation or management of a farm depends upon the facts and circumstances. Factors which tend to indicate active participation include participating in the decisions involving the operation or management of the farm, actually working on the farm, living on the farm, or hiring and discharging employees (as compared to only the farm manager). Factors which tend to indicate a lack of active participation include lack of control of the management and operation of the farm, having authority only to discharge the farm manager, having a farm manager who is an independent contractor rather than an employee, and *having limited liability for farm losses.*

[S. Rept. 94-1236, at 414 (1976), 1976-3 C.B. (Vol. 3) at 818.[5] Emphasis supplied.]

This language also apppears in the Joint Committee explanation accompanying the legislation as enacted. See J. Comm. Explanation, 1976-3 C.B. (Vol. 2) at 59.

The legislative history of section 464 indicates that limited liability for farm losses is one of the factors we may consider in determining whether a person is a "limited

---

[4]The Senate Report provides that "a person will be considered to have limited risk if he is protected against loss to any significant degree by nonrecourse financing, stop-loss orders, guarantees, fixed price repurchase (or purchase) agreements, insurance, or other similar arrangements." S. Rept. 94-938, 94th Cong., 2d Sess., at 60, 1976-3 C.B. (Vol. 3) at 98.

[5]These factors were incorporated into the proposed regulations under sec. 464 in the definition of "limited entrepreneur." See sec. 1.464-2(a)(3), Proposed Income Tax Regs., 48 Fed. Reg. 51939 (Nov. 15, 1983).

entrepreneur." Since the parties have expressly limited their summary judgment motions to exclude the issue of whether petitioners are "limited entrepreneurs," we need not consider whether petitioners' liability for farm losses was limited.[6]

To reflect the foregoing,

*An appropriate order will be issued.*

---

[6]Petitioners contend that a broad interpretation of the terms "enterprise" and "allocable" would bring all farming contracts within the definition of "farming syndicate." We are assured that this result would not occur. Persons legitimately involved in farming operations, and their families, would be excepted from the farming syndicate provisions either because they would not qualify as "limited entrepreneurs" under sec. 464(c)(1)(B) or because they would satisfy the active management exception of sec. 464(c)(2).