DAN L. GOLDWASSER AND MONIQUE G. GOLDWASSER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Goldwasser v. Commissioner
Docket No. 4563-85.
United States Tax Court
T.C. Memo 1988-523; 1988 Tax Ct. Memo LEXIS 548; 56 T.C.M. (CCH) 606; T.C.M. (RIA) 88523; November 10, 1988. *548 Petitioner entered into a sale-leaseback transaction whereby he purchased from and leased back to Health-Chem certain computer peripheral and copying equipment. The equipment was subject to end user leases which had been negotiated and entered into by a prior owner of the equipment. Held: petitioner did not have a business purpose for entering into the transaction which also lacked economic substance; neither did petitioner prove that he acquired the benefits and burdens of ownership of the equipment or that a nonrecourse note used to finance the transaction constituted genuine indebtedness. Held further: petitioner is liable for increased interest under section 6621(c), formerly section 6621(d). Leon C. Baker, for the petitioners. Kevin M. Flynn, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACTS AND OPINION WHITAKER, Judge: By statutory notice dated December 21, 1984, respondent determined a deficiency in petitioner's [1] *549 Federal income taxes for the years and in the amounts as follows: Year
Amount
1979
$ 16,110
1980
21,965 In his amended answer, respondent seeks increased interest pursuant to sectin 6621(c) of the Internal Revenue Code of 1986, formerly section 6621(d). [2] The issue presented is whether petitioner is entitled to deductions for depreciation and interest arising from his purchase of computer and other office equipment from Health-Chem Corporation Health Chem and the lease of that equipment back to Health-Chem. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation and attached exhibits are incorporated herein by this reference. At the time he filed his petition herein, petitioner was a resident of Scarsdale, New York. Petitioner's first contact with Health-Chem was in January 1969 when petitioner was an associate with a large New York City law firm. While in this position, petitioner assisted Leon Baker (Baker), Health-Chem's general counsel and counsel to the law firm with which petitioner was associated, *550 with certain of Health-Chem's transactions. Baker was Health-Chem's general counsel and held a seat on its board of directors. During the years at issue, Health-Chem was a publicly held corporation whose stock was traded on the American Stock Exchange. It was engaged in the manufacture and distribution of synthetic fabrics, controlled release dispensers, health care products, industrial paint, hardware, and giftware. Health-Chem was not in sound financial shape in 1969. Over the next 10 years, however, and while petitioner maintained professional contact with Baker and Health-Chem, the corporation became quite successful. Petitioner attributed Health-Chem's success to the efforts of Baker and Marvin Speiser (Speiser), who along with Baker had acquired Health-Chem and who was its president and chief executive officer. Petitioner was of the opinion that these two men were extraordinarily gifted businessmen. Petitioner first became acquainted with computers in the late 1960's and early 1970's in connection with law office word processing equipment and as a result of having been in charge of the purchase of such equipment by the firm he was with in the 1970's. Petitioner had also *551 toured Health-Chem's computer facility in York, Pennsylvania, during the course of his professional relationship with that company. In 1978, after petitioner became special counsel to Health-Chem, he reviewed a series of computer-leasing transactions for the company at the request of Roy Marcus, then Health-Chem's vice president in charge of financial operations. Petitioner did not review these transactions for the purpose of determining their tax consequences. On October 1, 1978, petitioner merged what had been for 3 or 4 years his solo securities law practice into an existing firm, becoming a partner of that firm. The firm had a practice of distributing a minimum partnership draw throughout the year with large year-end bonuses to the partners. In anticipation of his 1979 year-end bonus, petitioner contacted Baker for investment advice. It was at that time that Baker first mentioned computer leasing, in which he was investing heavily both as an agent for Health-Chem and for his own account. As the end of 1979 approached, petitioner became aware that his year-end bonus was going to be between $ 50,000 and $ 60,000 and had decided to invest a large portion of his bonus in computer *552 leasing. By this time, petitioner had engaged in many conversations wit Baker concerning computer leasing and had been introduced to a proposed transaction. The purchase made by petitioner, which was concluded toward the end of December 1979, was the last in a series of transactions involving the equipment purchased. The equipment was manufactured by Olivetti Corporation of America (Olivetti), [3] which leased the equipment to the equipment's end users. However, Olivetti did not seek to gain entry into the United States leasing market, preferring to sell its equipment. By agreement dated December 15, 1975, Olivetti sold to Metalease, Inc. (Metalease), "all leases or conditional sales contracts in excess of $ 750 entered into between customer and Olivetti doing business as agent for 'Olivetti Leasing Corporation' [4] for the lease or conditional sale of equipment." The contract of sale also covered the underlying equipment. Metalease financed the purchase of the equipment and *553 leases with Equico Lessors, Inc., (Equico), a subsidiary of the Equitable Life Insurance Company, by agreement dated December 29, 1975. More particularly that agreement constituted the grant to Equico of a right of first refusal whereby Metalease would offer for purchase by Equico all payments under the contracts purchased from Olivetti. Metalease was not to hold such contract payments for its own account. Metalease did not warrant the credit worthiness of an end user, and upon default by any end user, Equico could look to Metalease only to the extent Metalease could look to Olivetti. The sale price for those rights was Metalease's invoice price plus additional amounts as specified in that agreement. Pursuant to a Master Purchase Agreement dated December 16, 1977, Metalease sold certain of the equipment and the underlying leases to Funding Systems Leasing Corporation (Funding). The equipment sold, as established by an amendment to the agreement dated May 9, 1978, included all equipment acquired by Metalease during 1976 and 1977, the first $ 1,000,000 in aggregate list prices of equipment acquired by Metalease during each of January and February 1978, and the first $ 2,000,000 *554 in aggregate list prices of such equipment acquired by Metalease during each of the months March 1978 through December 1979. Similar terms were agreed to for 1980 by a second amendment dated January 1, 1980. The agreement contained an option for the sale of equipment purchased by Metalease in excess of what Funding was required to purchase thereunder. The purchase price was payable partly by a limited recourse promissory note and was secured by a subordinated lien [5] on the equipment and leases. Also on December 16, 1977, the parties entered into an agreement whereby Metalease was appointed Funding's "sole and exclusive agent to manage each item of equipment * * *." This gave Metalease the right to "market, remarket or sell the equipment, or enter into, modify, terminate or cancel any User Lease * * * and to exercise all such other powers and rights as shall generally be appropriate to one who has the exclusive right and power to manage property." Metalease was to receive as its annual management fee 1 percent of the list price of the equipment, payable "only as, if and when net *555 proceeds sufficient to pay such fees have been collected." The Management Agreement was to run for a term of 7 years wit respect to each piece of equipment, commencing on the date the equipment was installed with its end user. On August 15, 1978, Funding entered into an agreement with Health-Chem to sell Health-Chem certain of the equipment which Funding was to purchase from Metalease. Pursuant to that agreement, Health-Chem was to purchase on a cumulative basis the first $ 1,000,000 in aggregate list prices of equipment acquired each month by Funding from September 1978 through December 1979. The agreement states that the purchase price was to be the equipment's list price; however, the actual purchase price included a 5-percent markup. The purchase price was paid 11 percent in cash at the time of the equipment's installation, and the remainder by a limited recourse promissory note payable in 96 monthly installments. Each monthly installment was to be equal to 1.432181 percent of the purchase price. The agreement stated that the equipment was to be "computer peripheral equipment" which Funding warranted to be new. Also on August 15, 1978, the parties entered a Master Agreement *556 of Lease whereby Health-Chem leased to Funding the equipment sold to Health-Chem under the Master Purchase Agreement. The lease commenced on the date the equipment was purchased by Health-Chem and ran for 96 months. The monthly rent was an amount equal to 1.432181 percent of the equipment's purchase price, which equaled Health-Chem's monthly payments. As is common in equipment leasing, the lease was on a net basis and Funding was required to pay all taxes (except Health-Chem's income taxes), maintenance expenses, and insurance. Funding was responsible for all physical damage and bore the risk of loss with respect to the equipment. Concurrently with the lease agreement, Health-Chem and Funding entered into a Master Remarketing Agreement whereby Funding was appointed Health Chem's agent to remarket the equipment after the end users' leases expired. As its compensation, Funding was to receive 10 percent of the net proceeds of the equipment's disposition, whether those proceeds were sale proceeds, rent, or insurance proceeds. Health-Chem had the option to terminate the remarketing agreement upon the occurrence of events specified in the agreement, which were primarily concerned with *557 Funding's solvency. On December 26, 1979, Health-Chem entered into an agreement with petitioner concerning the equipment delivered to Health-Chem by Funding during November 1979 (the November equipment). Pursuant to their agreement, Health-Chem sold [6] to petitioner "all equipment which [Health-Chem] purchased from FUNDING pursuant to the MASTER PURCHASING AGREEMENT November 1979 * * * up to $ 350,000 worth of NOVEMBER EQUIPMENT." Petitioner's purchase price was 101 percent of Health-Chem's purchase price, 1.5 percent of which was to be paid upon delivery to petitioner of documents evidencing the sale of the November equipment by Funding to Health-Chem. Petitioner was also to pay Baker an attorney's fee of 1 percent of the purchase price at the same time that he made the initial payment. Since the equipment, and hence the exact purchase price, had not been identified at the time the agreement was entered into, petitioner paid $ 5,000 to Baker, as attorney for Health-Chem, on the date the agreement was signed. While petitioner *558 did not know exactly what kind of equipment he had bought at the time he entered into the transaction and had no input into the selection of the November equipment, he did receive an equipment schedule approximately 60 days after completing the transaction. However, that schedule listed no more than the invoice numbers of the actual units purchased and contained no description of any of the equipment. [7] Prior to petitioner's entering into the transaction, Baker had shown him either a loose-leaf notebook or brochure containing pictures and descriptions of Olivetti equipment, which petitioner reviewed only to become generally familiar wit Olivetti equipment. He thought that the November equipment consisted mostly of new computer peripheral equipment which petitioner thought was not subject to rapid technological obsolescence. It was not until the summer of 1987 that petitioner learned from respondent's counsel that 9 percent of the November equipment was used and 35 of the 699 pieces of equipment in his portfolio were photocopiers. Petitioner's schedule of the November equipment stated that its actual list *559 price was $ 322,005. Health-Chem's price for the November equipment, including the 5 percent markup, was $ 338,105.99. Petitioner's purchase price, which was 101 percent of Health-Chem's purchase price, was $ 341,487.05. Once the purchase price was determined, petitioner satisfied his obligations concerning the initial cash payment and Baker's legal fee by paying $ 3,537.18 to Baker, as Health-Chem's attorney, on March 17, 1980. The remainder of the November equipment's purchase price was financed by promissory notes. Petitioner executed two full recourse promissory notes due on July 1, 1980, and January 2, 1981, in the principal amounts of $ 25,611.53 (7.5 percent of the purchase price) and $ 10,244.61 (3 percent of the purchase price), respectively. These promissory notes also required petitioner to pay a stated amount of "interest" in accordance with the purchase agreement. These amounts are $ 1,775.73 (.52 percent of the purchase price for the note due July 1, 1980) and $ 1,024.46 (.3 percent of the purchase price for the note due January 2, 1981). Both notes provided for interest at the rate of 12 percent per annum, except in the event of any prepayment, when the interest *560 rate was reduced to 10 percent. Finally, petitioner executed a nonrecourse promissory note in the principal amount of $ 300,508.55, with interest at 12 percent, payable in semi-annual installments of $ 24,955.90 on each January 1 and July 1 until January 1, 1991. While these notes were dated December 26, 1979, petitioner did not actually execute them until March 1980, after the equipment was identified and the purchase price determined. After satisfaction of the two recourse notes, petitioner's total cash investment, including Baker's legal fee was therefore $ 44,393.15, which was 13 percent of the November equipment's purchase price. [8] Pursuant to the agreement, *561 Health-Chem assigned to petitioner all its rights with respect to the November equipment under its Master Purchase Agreement, Master Agreement of Lease, Limited Recourse Promissory Note, and Master Remarketing Agreement with Funding. Health-Chem was authorized to apply the rents it received under the Master Agreement of Lease with Funding to the Limited Recourse Promissory Note to which the equipment was subject. Further, on each December 31 through 1985, petitioner was to deliver to Health-Chem a document whereby he agreed to assume a percentage of the amount payable to Equico in each subsequent year. On December 31, 1979, petitioner executed the first such agreement which stated as follows: December 31, 1979 Equico Lessors Inc.
1285 Avenue of the Americas New York, NY 10019 Gentlemen: I refer to the obligation (DEBT) to you (EQUICO) of Metalease, Inc. (doing business as Olivetti Leasing Corp.) (DEBTOR) relating to data processing equipment (EQUIPMENT) manufactured by Olivetti Corporation of America, a portion of which EQUIPMENT I have purchased under an agreement between me and Health-Chem Corporation (HC). Pursuant to my agreement with HC I hereby assume payment of DEBTOR'S *562 obligation to you relating to EQUIPMENT I have purchased falling due during the period January 1, 1980 through December 31, 1980 to the extent of $ 11,000.00. This assumption is subject to the condition that neither the sublessees of the EQUIPMENT for HC is in default under any lease or sublease of the EQUIPMENT as of the date this assumption agreement is executed. I shall not be required to make any payment hereunder until you have exhausted all your remedies against DEBTOR, all sublessees, HC and the EQUIPMENT (including foreclosure). I will pay such amount as I am liable to pay you hereunder in ten equal installments without interest on each January 1 following determination of the amount of my liability. Very truly yours, /s/ Dan Goldwasser Petitioner executed nearly identical documents on December 31, 1980, and December 28, 1981, which relate to years not before the Court. Contemporaneously with the execution of the purchase agreement, Health-Chem and petitioner entered into an agreement whereby the equipment was leased back to Health-Chem. The lease called for three tiers of rental payments. From July 1, 1980, through January 1, 1991, Health-Chem was to pay 7.318 percent *563 of the November equipment's purchase price ($ 24,990.02) on the first day of each calendar half year. [9] The second tier increased the rental payment by .198 percent ($ 676.14) for each half year beginning July 1, 1981. The final tier (hereinafter referred to as contingent rent) did not become operative until January 1, 1988, [10] *564 after which Health-Chem was to pay petitioner contingent rent based on the following percentages of gross rental income [11] to the extent such gross rental income exceeded .198 percent of the purchase price on a semi-annual basis. 1988
30%
1989
40%
1990
50%
Disregarding the contingent rent, Health-Chem's rental payments of $ 25,666.16 were $ 710.26 greater than petitioner's payments under the nonrecourse note of $ 24,955.90, leaving petitioner with positive cash flow of $ 1,420.52 per year. [12]
Like the Master Agreement of Lease between Health-Chem and Funding, the lease was on an absolutely net basis. Health-Chem paid all taxes (except petitioner's income taxes with respect to the equipment), all maintenance costs, and all insurance costs. Further, Health-Chem was to bear the entire risk of loss of the equipment, and should any piece of equipment be destroyed, Health-Chem was to effect replacement wit no cessation *565 of the obligation to pay rent. Health-Chem retained the investment credit available wit respect to the November equipment. Petitioner's general understanding of computer leasing was that it was an offshoot of the financing industry, with the seller/lessor's rental payments approximating the buyer/lessee's mortgage payments. Petitioner also understood that the buyer/lessee's profit depended to some extent upon the residual value of the equipment at the end of the lease. Petitioner "hoped" that the November equipment would have a residual value of between 20 and 25 percent. Petitioner's opinion of the November equipment's residual value and his basis for that opinion is best understood through his trial testimony which is set out in Appendix B attached hereto. Petitioner did not obtain any appraisal or evaluation of the November equipment, nor did he rely on any opinion by any officer of employee of Health-Chem. His belief in a high residual value for peripheral equipment was based in part on his own experience wit other used business equipment and furniture and in part on sale of such items which he had seen sold in the second hand market. Petitioner had some experience in the *566 used office equipment market, having furnished his own office when he was in private practice with second hand office equipment and furniture. Most of this equipment and furniture was purchased at auctions at which no computer equipment was sold. In his solo law practice, petitioner bought most of his office equipment at office supply stores where he looked at both new and used equipment. Petitioner made a cash investment of 13 percent of the purchase price of the November equipment. However, through the 11 year life of the lease, petitioner would receive only a 4.5 percent return, assuming no contingent rental. In order to break even, petitioner needed to obtain a return of an additional 8.5 percent of the November equipment's purchase price from either contingent rent or residual value. Although the end user leases ran for a maximum of 60 months, petitioner felt that there was a fairly strong probability that the end users would renew their leases at reduced prices. Petitioner thought that since the end users were primarily doctors, small businesses and the like that they would keep a system with which they and their employees had become familiar. Respondent called as his expert *567 witness S. Paul Blumenthal (Blumenthal) senior vice-president of American Technological Appraisal Services (ATAS). Blumenthal's report contains a description of Olivetti equipment which was copied from either Olivetti promotional material or DataPro, a computer industry publication. [13]Blumenthal's first step was to determine a fair market value for each piece of November equipment on the transaction date. To determine this fair market value, Blumenthal consulted a database compiled by his staff at ATAS which included "asked" prices of used equipment that had been quoted in advertising, sent out from ATAS in response to mailed-in requests, and contained in weekly publications. The "asked" prices in this database were only for used equipment even though 91 percent of the November equipment, to which equipment in the database was compared, was new. The database did not distinguish, for instance, between models which were introduced on a certain date and particular machines that were manufactured at a later date. The database contained in large part equipment other than that purchased by petitioner. In the absence of hard data for any particular model of November equipment, Blumenthal *568 examined data for comparable equipment, determined an average rate of decline in value, and applied that rate to the November equipment. To determine the residual value of the equipment, Blumenthal merely extrapolated the rate of decline into the future. [14]
Due to technological and physical deterioration, the entire package of November equipment had, in Blumenthal's opinion, already declined in value to 58 percent of its list price on the date of sale although it was new equipment. Blumenthal then determined the useful life of each piece of November equipment. He concluded that 8 of the 14 models in petitioner's portfolio had a useful life of just 6 years, and that no model had a useful *569 life of more than 10 years. Using his extrapolation technique and estimate of useful life, Blumenthal determined that the equipment's residual value would be as follows: Date
Value
Percentage
12/79
$ 185,796
58%
12/80
136,475
42%
12/81
95,536
30%
12/82
57,876
18%
12/83
33.096
10%
12/84
15,346
5% 12/85
4,959
2% 12/86
1,468
.5% After December 1986, Blumenthal expected the November equipment to be worthless. Petitioner proffered no expert at trial. OPINION Respondent has disallowed petitioner's deductions for depreciation and interest on several grounds. In his notice of deficiency respondent asserts that petitioner did not acquire the benefits and burdens of ownership of the November equipment and did not enter into the transaction for the purpose of making a profit. Sec. 183. Respondent also asserts that petitioner's nonrecourse debt was so contingent as to not be properly includable in his basis in the property. Respondent also claims that petitioner was not "at risk" within the meaning of section 465 for part, if not all, of the November equipment's purchase price. By an amendment to his answer, respondent claims additional interest pursuant to section 6621(c), formerly 6621(d). At trial, respondent *570 asserted that petitioner had no business purpose for entering into the transaction, and that the transaction was devoid of economic substance, relying on Rice's Toyota World, Inc. v. Commissioner,81 T.C. 184 (1983), affd. in part and revd. in part 752 F.2d 89 (4th Cir. 1985). While respondent did no present this argument in the statutory notice or the pleadings, petitioner has not asserted that he was prejudiced, and we find that this issue was tried with his implied consent. See Ruge v. Commissioner,26 T.C. 138, 142 (1956). However, respondent bears the burden of proof with respect to this issue. [15] Rule 142(a). It is to this issue that we first turn. Resolution of this issue depends on whether the form of the transaction should be respected or whether its substance requires that it be treated differently for Federal income tax purposes. While we do not hesitate to require transactions to be taxed in accordance with their true nature, the form given a transaction by the parties will be respected where there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory *571 realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached * * *. [Frank Lyon Co. v. United States,435 U.S. 561, 583-584 (1978).] In such cases, "the Government should honor the allocation of rights and duties effectuated by the parties." Frank Lyon Co. v. United States, supra at 584. In Rice's Toyota World v. Commissioner,81 T.C. 184 (1983), affd. in part and revd. in part 752 F.2d 89 (4th Cir. 1985), we followed Frank Lyon in the context of computer leasing, stating that Frank Lyon stands for the principle that, in a sale-leaseback context, a nonuser-owner recipient of tax benefits must prove that his entry into the transaction was motivated by a business purpose sufficient to justify the form of the transaction. And further, he must show that the underlying transaction was supported by economic substance, i.e., the possibility of profit. * * * [Rice's Toyota World v. Commissioner, supra at 201-202.] While we have held that a transaction imbued with economic substance will be recognized even in the absence of a business purpose, Larsen v. Commissioner,89 T.C. 1220, 1253 (1987), "the presence *572 of business purpose does not entitle a transaction to be recognized for Federal tax purposes where objective indicia of economic substance indicating a realistic potential for economic profit are not manifest. Cherin v. Commissioner,89 T.C. 986 (1987)." Larsen v. Commissioner, supra at 1252 n. 13. Respondent argues that both business purpose and economic substance are missing in this case, and that petitioner entered into the transaction solely to shelter income received from his law practice. We noted in James v. Commissioner,87 T.C. 905, 918 (1986), that "the tax laws affect the shape of every business transaction * * *." Consequently, the generation of tax benefits does not necessarily mean that the transaction lacks either business purpose or economic substance, Larsen v. Commissioner, supra at 1252. However, the transaction must offer a reasonable opportunity for economic profit exclusive of tax benefits. Gefen v. Commissioner,87 T.C. 1471, 1490 (1986). See also Estate of Thomas v. Commissioner,84 T.C. 412, 438 (1985). Respondent argues that no such opportunity exists in this case. For the reasons discussed below, we find that respondent has proven that petitioner had *573 no business purpose for entering into the transaction, and that the transaction lacked economic substance. Business Purpose
Respondent points to several facts as evidence of petitioner's lack of business purpose. First respondent points out that the purchase of the November equipment was completed in a very hurried manner, taking place between the time that petitioner's 1979 bonus could be ascertained and the end of that year, ostensibly to take advantage of tax benefits in 1979. However, since the mere existence of tax benefits will not cause us to look beyond the form of the transaction, the acceleration of otherwise proper tax benefits into an earlier year does not, in and of itself, constitute a negative factor. Petitioner's failure to investigate the transaction and the November equipment is however indicative of his lack of a business purpose. Petitioner made no attempt to investigate the type of equipment he was purchasing, and at the time he entered into the transaction was aware of no more than the fact that he had purchased what he thought was Olivetti minicomputers and computer peripheral equipment.[16] Even after obtaining a list of the November equipment in March 1980, *574 which contained no descriptions, petitioner did not attempt to inspect the equipment (which may have been difficult as a practical matter), and did not attempt to ascertain the type of equipment he had purchased. However had petitioner consulted the brochure supplied to him by Baker, he could have readily matched model numbers and become aware of the fact that fully half of the November equipment consisted of copying machines. In the sale-leaseback context, we have held that a failure to exercise ordinary care in ascertaining the identity, location, and end user of leased equipment is "imprudent conduct" and "suggests that the business substance of these leasing transactions was not of primary concern to petitioners." James v. Commissioner, supra at 921. [17] *575 We do not think a reasonably prudent businessman would invest in equipment, with the objective of making a profit, when the only thing he knew about the equipment was that it was "minicomputers and computer peripheral equipment." See Larsen v. Commissioner, supra at 1254. Petitioner argues that he implicitly relied upon the business acumen of Baker who was buying equipment for Health-Chem and his own account, thus obviating any need for him to make an independent investigation. [18] Petitioner has neither alleged nor proven that Baker's investments for his own account were on the same terms as petitioner's. However, investments made by Baker for Health-Chem have been shown to be under different terms; Health-Chem's lease to Funding was for 8 years, while petitioner's lease to Health-Chem was for 11 years. While Health-Chem did not have the opportunity for contingent rent, it was able to realize residual value 3 years earlier than petitioner. Further, Health-Chem retained the investment credit with respect to the November equipment, which allowed it to recoup almost entirely its cash investment at the end of the tax year after acquisition. [19] Finally, while the parties appear to have assumed that Health-Chem's transactions *576 with Funding have economic substance, we make no such finding on this record. Characterization of this underlying series of transactions is far from clear. Petitioner also argues that his experience with computer equipment gained through furnishing his office with used furniture and equipment and his participation in the decision to buy word processing equipment *577 for a firm with which he has been associated allowed him to become sufficiently familiar with computer peripheral equipment to be able to evaluate the investment for himself. We do not find this argument persuasive. As stated above, we do not think that petitioner would have entered into a transaction from which he intended to make a profit without an inspection of the equipment on which the profit was to be made,or without ascertaining what that equipment was. Further, we are not persuaded by petitioner's testimony concerning his familiarity with the used office equipment and furniture market and the effort he put into purchasing such items for his own use. His experience in evaluating and purchasing equipment for his office was primarily concerned with office machines and furniture, although he had some familiarity with word processing equipment. Thus the experience he had in this area was unrelated to the equipment in which he invested. Experience is irrelevant unless applied, and petitioner has not convinced us that he put to use any experience that he did have; indeed, his testimony and the objective evidence indicates to the contrary. While petitioner has testified that *578 he intended to make a profit on the transactions, greater weight is given to the surrounding objective facts, which in this case support respondent's determination. Dreicer v. Commissioner,78 T.C. 642, 645 (1982), affd. without published opinion 702 F.2d 1205 (D.C. Cir. 1983). Economic Substance
Neither has petitioner produced sufficient evidence to rebut respondent's showing that the transaction lacked economic substance. The objective test of economic substance is whether or not the transaction in which petitioner was engaged held out a realistic opportunity for profit. Mukerji v. Commissioner,87 T.C. 926, 964 (1986). Due to the nature of computer-leasing transactions, parties to such transactions seldom, if ever, realize income in the form of substantial positive cash flow during the term of the lease. See Estate of Thomas v. Commissioner,84 T.C. 412, 436 (1985). In such cases buyer-lessors must rely upon the value of the equipment at the end of the lease term for their profit. This residual value is to be determined on the basis of facts known at the time the transaction was entered into, Mukerji v. Commissioner, supra at 965, and is an appropriate subject for expert testimony. *579 We find a great many infirmities in Blumenthal's opinions, contained in his report, of fair market value at the time of purchase and residual value. However, we need not accept an expert's opinion in its entirety, Parker v. Commissioner,86 T.C. 547, 562 (1986), and are not bound to the opinion of any expert witness when that opinion is contrary to our own judgment. Chiu v. Commissioner,84 T.C. 722, 734 (1985). In the exercise of sound discretion, we may embrace only those portions of expert testimony which in our judgment are appropriate. Helvering v. National Grocery Co.,304 U.S. 282 (1938). The first step in Blumenthal's analysis was a determination of the fair market value of the November equipment at the time of purchase. Blumenthal took note of the introduction date of the particular piece of equipment and the price at which he found it was selling on the used market in November 1979. Based upon the list price at the date of introduction and the price on the used market, Blumenthal discounted the list price of each piece of November equipment from 10 percent to 73 percent. This amounted to a total discount of 42 percent for the entire package of November equipment. [20] *580 We find this approach to be erroneous and contrary to our own judgment concerning the fair market value of the November equipment. Because he concentrated so much on the used equipment market as it existed in November 1979, Blumenthal seems to have assumed that each piece of equipment was placed in service at the time of its introduction into the market, which in some cases was as early as 1973. The stipulated facts and documents in this case conclusively show that such was not the case. Blumenthal was in agreement with petitioner that computer peripheral equipment did not suffer from technological obsolescence in the same manner as central processors, but did suffer from physical deterioration. Therefore a copier or piece of peripheral equipment, such as a printer or disc drive, would theoretically be worth its list price from the date of introduction into the market until it wasput into use and started to deteriorate. Any technological obsolescence would be reflected in a change in the list price. We find that Blumenthal's assumption *581 is a fatal flaw in his opinion of fair market value. Since his opinion of residual value uses fair market value as its base, it is necessarily flawed in a similar manner, and must be rejected. In the course of determining residual values for the November equipment, Blumenthal made a determination of the useful life of each item of equipment, which is incorporated into Appendix A. Blumenthal found that none of the November equipment had a useful life of more than 10 years, and that most of it had a useful life of only 6 years. We think that his opinion regarding the equipment's useful life is not unreasonable and is entitled to some weight, especially in light of the fact that petitioner has not presented us with any evidence concerning the November equipment's useful lie or residual value. While his entire report is long on conclusion and short on analysis, his opinion of useful life does not suffer from the same flaw as his opinion of residual value. The life of a piece of equipment that deteriorates physically, as opposed to technologically, should remain constant regardless of when it is put into service. Petitioner makes several arguments in response to Blumenthal's opinion. *582 His first contention is that we found copiers to have a useful life of from 15 to 18 years in Torres v. Commissioner,88 T.C. 702 (1987). However, Torres involved IBM and Xerox copier which were much larger than the copiers in this transaction, [21] and did not involve computer peripheral equipment at all. Petitioner also argues that Blumenthal erred in assuming that no maintenance contacts were in force for the November equipment. Petitioner state on brief that "there is nothing in the record to suggest that the user-lessees did no enter into customer maintenance agreements with the Olivetti dealers or that, if they did not, they would not have the equipment serviced when required." This argument is also without merit. Pursuant to our Pre-trial Order, petitioner's counsel should have received a copy of Blumenthal's report at least 15 days before the date of the trial. If he did (and he has not suggested that he did not) he certainly had adequate time to gather evidence to prove this assumption on the part of Blumenthal erroneous. We noted in Torres v. Commissioner, supra at 724, that such agreements affected the value of copying equipment, but we may make no assumptions in the *583 absence of proof of such agreements. Petitioner provided no expert testimony or other evidence regarding the residual value of the November equipment. However, it is clear on this record that in the absence of any contingent rent in years 9, 10, and 11 of petitioner's lease or residual value after that time, petitioner could not have made a profit. His $ 44,393.15 cash investment [22] *584 would have yielded only $ 15,625.72 in positive cash flow over the 11-year lease term. Petitioner argues however that he expected significant contingent rent during years 9, 10, and 11 of the lease and a residual value of 20 percent. He expected that the original end users would continue to lease the equipment and thereby constitute its best market. The reason given for this, both in petitioner's trial testimony and on brief, is that most of the end users did not need sophisticated equipment and would renew their leases, albeit at a lower rent, in order to avoid retraining expenses. Given petitioner's 13-percent investment and 4.5-percent return through cash flow, the November equipment need only be shown to have a residual value of 8.5 percent in order for petitioner to break even. However, to rebut respondent's case, petitioner must provide us with some proof that it is reasonable to expect this profit, aside from any tax savings. Rice's Toyota World, Inc. v. Commissioner,81 T.C. 184, 201-202 (1983), affd. in part and revd. in part 752 F.2d 89 (4th Cir. 1985). While Blumenthal's opinion of residual value is unreliable, we think that his opinion of useful life requires that we find that the November equipment would have deteriorated to virtual or actual worthlessness by the time petitioner's lease with Health-Chem ended. Many of the models would have reached the end of their useful lives by the time petitioner was eligible to collect contingent rent. We have *585 no basis for determining how much, if any, contingent rent would have been generated by the remaining equipment, and in the absence of any proof on behalf of petitioner, find that none would be generated. We do not think that petitioner's reliance upon his limited experience and his beliefs as to the residual value of the equipment constitute objective evidence. We have not overlooked petitioner's argument that his investment would someday reach a "turn-around" point and begin to generate taxable income without significant cash flow, with the result that net tax savings upon completion of the transaction will be less than petitioner's cash investment. However, this subjective statement of petitioner's intent, i.e., that he had no tax avoidance motive, has no place in, nor impact upon the objective analysis of a transaction's economic substance. More simply, in an analysis in which tax savings are disregarded, see Rice's Toyota World v. Commissioner, supra, a tax savings motive is irrelevant. Benefits and Burdens of Ownership
Unlike his argument that the transaction lacks business purpose and economic substance, respondent's determination regarding the benefits and burdens of ownership, *586 which was set forth in the statutory notice of deficiency, is presumptively correct. Welch v. Helvering,290 U.S. 111 (1930); Rule 142(a). In Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221 (1981), we pointed to eight factors relevant in determining whether a sale occurred. These factors are: (1) whether legal title passed, (2) whether the parties treated the transaction as a sale, (3) whether the alleged purchaser acquired an equity in the property, (4) whether the contract of sale creates a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments, (5) whether the purchaser is vested with the right of possession, (6) whether the purchaser pays property taxes following the transaction, (7) whether the purchaser bears the risk of loss or damage to the property, and (8) whether the purchaser receives the profits from the operation and sale of the property. These factors are properly taken into consideration in sale-leaseback transactions. Torres v. Commissioner,88 T.C. 702, 720 (1987). Certain of these factors are either irrelevant, neutral, or easily cast in a form favorable to a taxpayer. Through the *587 use of a purchase agreement, recourse and nonrecourse notes, and a bill of sale the parties treated the transaction as a sale, and legal title to the November equipment passed between them. Compare Coleman v. Commissioner,87 T.C. 178 (1986), affd. by unpublished order 833 F.2d 303 (3d Cir. 1987). Of course, end users were entitled to possession. Further, since net leases are common in such transactions, the fact that the seller-lessee pays all property taxes and bears the risk of loss with respect to the equipment is a neutral factor. Estate of Thomas v. Commissioner,84 T.C. 412, 433-434 (1985). The fact that the rental payments and debt service were substantially offsetting is also a neutral factor. Estate of Thomas v. Commissioner, supra at 436. Whether a buyer-lessor has an equity in property is one of the most relevant factors from Grodt & McKay that can be applied to sale-leaseback transactions; it is the stuff of substance and only when it meshes with the form of the transaction does it constitute a sale. See Estate of Franklin v. Commissioner,544 F.2d 1045, 1048 (9th Cir. 1976), affg. 64 T.C. 752 (1975). A taxpayer without an equity in the property has no depreciable *588 interest in the property, but rather has merely purchased tax benefits. See Houchins v. Commissioner,79 T.C. 570, 602 (1982). Here, petitioner has not proven that he had any equity in the November equipment. As we stated in Torres v. Commissioner, supra at 721: The relevancy of equity, in a case where only nonrecourse debt is used in the purchase of property, [23] is that the presence of absence of equity is likely to determine whether the purchaser of the property continues to act like the owner of the property. * * * In this case, however, the nonrecourse debt is effectively self-amortizing and whether Regency continues to act like the owner of the equipment throughout the term of the lease is likely to depend on whether contingent rent is being generated by the equipment and whether a significant residual value is expected to exist at the end of the leaseback term. * * * Petitioner has not shown that any contingent rent or residual value may be expected from the November equipment, and because of its limited useful life it seems *589 that none was likely. Further, because of this short useful life and extended period over which the note is to be paid, there will come a point when valueless equipment will be the only security for a still unpaid note. In such a situation -- increasing disparity between the value of an asset and the unpaid note -- we have held that a taxpayer had no equity in the asset. [24]
However, the existence of taxpayer's equity is not singularly determinative. Other factors to which we may refer were set out in Torres v. Commissioner, supra at 721, and Estate of Thomas v. Commissioner, supra at 436, 438. These include (1) the existence of useful life of the property in excess of the leaseback term, (2) the existence of a purchase option at less than fair market value, [25] (3) renewal rental at the end of the leaseback term set at fair market rent, (4) the reasonable possibility that the purported owner of the property can recoup his investment in the property from the income-producing potential and residual value of the property, (5) the taxpayer's equity interest as a percentage of purchase price, and (6) the expectation of a turnaround point *590 at which time the investment would begin producing taxable income in excess of deductions in the later years of the lease with net tax benefits over the entire term of the lease less than the unrecovered cash investment.
Many of these factors overlap factors which we examine in determining whether a transaction has economic substance, such as useful life, renewal rental, and residual value. We have already decided that the useful life of the November equipment does not outlive the leaseback term; indeed, given Blumenthal's opinion of useful life, the lease will extend past the useful life of each model of the November equipment. Since the useful life will end before the leaseback expires, the value of the November equipment at that time will be no more than scrap; any proceeds from the sale of the equipment as scrap would, according to Blumenthal, be less than the cost of remarketing or disposing of the equipment. [26] Petitioner has proven only that he expected to recoup less than half of his cash investment. He has not proven that he would make a profit from contingent rentals and residual value. Blumenthal's opinion of useful life makes *591 it doubtful that petitioner would realize either. Therefore, there was no possibility that petitioner could recoup his investment or receive renewal rental at the end of the lease term. Petitioner has shown that his cash investment as a percentage of the purchase price was reasonable; however, we find that this positive factor is greatly outweighed by what we regard as the negative factors surrounding the transaction. We therefore find that petitioner did not have the benefits and burdens of ownership of the November equipment, but that he merely acquired a right to minimal cash flow and a future interest in equipment that would be worthless when his interest became possessory. Therefore, his depreciation deductions were properly disallowed.
Interest Deductions
We also hold that respondent properly disallowed petitioner's interest deductions. It is well settled that for interest to be deductible under section 163(a), the underlying indebtedness must be genuine. Knetsch v. United States,364 U.S. 361 (1960); Elliott v. Commissioner,84 T.C. 227, 244 (1985), *592 affd. without published opinions at 782 F.2d 1027 (3d Cir. 1986). As we stated in Coleman v. Commissioner,87 T.C. 178, 209 (1986), affd. without published opinion at 833 F.2d 303 (3d Cir. 1987), "where * * * the purchase price and principal amount of the nonrecourse note unreasonably exceed the value of the property interest acquired * * * it is settled that no genuine indebtedness exists." Since petitioner did not acquire the benefits and burdens of ownership, any property interest which he acquired could not have been a fee simple interest in the November equipment. Rather, we think that petitioner's cash investment "was clearly paid for the right to participate in the contingent benefits hopefully to be derived from the future use of the equipment at a point of time when that use was at best speculative * * *." Coleman v. Commissioner, supra at 208. Because of the great likelihood that petitioner would never realize any contingent rent or residual value, the property interest which petitioner purchased could have been no more than the right to participate in minimal cash flow. The nonrecourse note was greatly in excess of the fair market value of this right; therefore it does *593 not constitute genuine debt and interest deductions with respect thereto were properly disallowed. Petitioner is, however, entitled to deduct interest on the recourse notes in accordance with the opinion of the court of appeals in Rice's Toyota World, Inc. v. Commissioner,752 F.2d 89 (4th Cir. 1985), revg. in part 81 T.C. 184 (1983). Rose v. Commissioner,88 T.C. 386, 423 (1987). Because of the foregoing, we need not decide whether the transaction was an activity engaged in for profit or whether deductions with respect to the transaction are limited by section 183. Neither do we need to discuss the applicability of the "at risk" provisions of section 465.
Section 6621(c)
In his amended answer, respondent claims additional interest pursuant to section 6621(c) of the Internal Revenue Code of 1986, formerly section 6621(d). We held in Patin v. Commissioner,88 T.C. 1086 (1987), affd. sub nom. without published opinion Hatheway v. Commissioner,856 F.2d 186 (4th Cir. 1988), that transactions without economic substance were economic shams within the meaning of section 6621(c)(3)(A)(v). As respondent has shown the transaction at issue here to be lacking in economic substance, Patin is *594 controlling; we therefore hold for respondent on this issue. In accordance with the foregoing Decision will be entered under Rule 155.
APPENDIX A Blumenthal's
Model
Description
Quantity
List Price
[27] Useful Life 93C
typewriter
1 $ 1,038.80
6   A4
small bus. comp.
2 8,595.00
10  BCS 2030
minicomputer
2 23,652.50
7   C605
copier
2 3,790.00
6   C1550
copier
20
74,612,04
6   C1600
copier
2 5,637.10
6-7 E4C
printer
3 3,038.75
10  ET221
typewriter
13
28,197.21
6   L93C
typewriter
2 13,182.07
6   [28] M500D 3 4,537.04
M900D
2 5,200.78
P6060
minicomputer
2 39,791.81
7   TES 401
W/P typewriter
3 3,488.38
6   TES 501
W/P typewriter
2 68,414.78
6   [29] S726 copier
9 19,173.15
6   S810
copier
1 19,656.25
7-8 APPENDIX B Excerpt from petitioner's trial testimony Q: (by Mr. Baker) What did you hope that the residual would be and on what basis did you have that hope? A: Well, my hope was that, starting *595 in year seven or eight, we would start getting a fairly substantial bonus rent. Knowing what I believed to be the nature of this equipment, I felt that there was a fairly strong probability that the end users would renew their leases, obviously not for the same rental that they would have paid when the equipment was brand new because there would be other equipment out in the market which would compete with this equipment, but I thought that there would be a fairly substantial throw-off. But even if that didn't take place, I thought that there would be a fairly substantial residual value in this equipment, and just based upon what I had seen in the auction experience, I had thought may be we would see as much as 20, 25 percent residual value down the road. On cross examination, petitioner stated: Q: (by Mr. Flynn) Did Mr. Baker or anyone from Health-Chem give you a written appraisal of the equipment? A: No. He merely told me the relationship of the purchase price to what was the list price. Q: The purchase price you were paying as to what Olivetti listed the equipment for? A: Yes. Q: So you were not given any appraisal as to its residual or projected future residual value? A: *596 That's correct. Q: No one from Health-Chem gave you that, I assume, as well. A: That's correct. * * * Q: Did you seek yourself to have anyone independently appraise the equipment? A: No, I did not. Q: And you said, sir, that you had a hope -- that was your word, 'hope' -- of a residual to the extent of 20 to 25 percent? A: That's correct. Q: And you had a gut feeling -- is that fair to say -- that that is what the projection could be? A: Yes. This is the sort of thing where I don't think anybody can clearly see the future. I felt that the experience that I had just seeing the way the used office equipment market worked was that this type of equipment would have a substantial value. I could only judge it from the business machines and typewriters that I had seen being sold in the second hand market, and they seemed to be selling at a fairly substantial price compared to the new equipment which I could have gone out and bought at the time. Q: * * * when you said 20 to 25 percent, you agree with me that that is 20 to 25 percent of what you don't know what you a purchasing because you didn't know what you were purchasing. A: That's correct. * * * Q: You mentioned that you had *597 some experience in going to auctions to look for certain equipment: isn't that right? A: That's correct. * * * Q: In most of the auctions you went to, it is also fair to say, is it not, Mr. Goldwasser, that they weren't even selling computer equipment? A: That's generally true. Most of the business equipment at the time consisted of adding machines, calculators and typewriters and copiers. Footnotes
1. Monique Goldwasser is a petitioner herein solely by virtue of having filed joint Federal income tax returns with her husband. All references to petitioner are to Dan L. Goldwasser.
2. Unless otherwise stated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. Olivetti is a subsidiary of Olivetti, Inc., an Italian Company. ↩
4. Olivetti granted to Metalease the right to use the name Olivetti Leasing Corporation in all its dealings concerning the leases and equipment. ↩
5. This lien, as was the case with all encumbrances on the equipment, was subordinate to Equico's lien. ↩
6. For convenience we use the terminology used by Health-Chem and petitioner without intending any inference as to the characterization of the transaction. ↩
7. A schedule listing petitioner's equipment is attached hereto as Appendix A. ↩
8. We cannot determine on this record how or when the recourse notes were satisfied. We assume that they were satisfied in a timely fashion since respondent has not contended otherwise. Petitioner received an adjustment in the purchase price and cash investment in the amount of $ 961.49 in 1987 when it was discovered that approximately 9 percent of the November equipment was not new at the time of delivery to the end users. We need not discuss the effect of this adjustment, as it relates to a year not before the Court. ↩
9. Each payment constituted rent for the previous 6-month period. The payment due July 1, 1980, covered the period January 1, 1980, through June 30, 1980. Likewise, the payment due January 1, 1991, covered the period of July 1, 1990, through December 31, 1990, after which time the lease expired. ↩
10. The lease agreement between Health-Chem and petitioner provides that contingent rent is to commence on January 1, 1987. However, no applicable percentage of gross rental income to be paid petitioner is set forth for 1987. Since the lease was to run for a term of 11 years, and contingent rent, if any, was to be paid over the last 3 years, we assume that contingent rent was to have commenced on January 1, 1988. 11. Gross rental income was defined in the lease agreement as gross income after recovery of all remarketing costs, including dismantling, shipping, sales commissions, and reinstallation costs. ↩
12. Although payments under the second tier were not to commence until July 1, 1981, a statement sent to petitioner on July 3, 1980, reflects that the rental payment credited to him for the first 6 months of 1980 included the second tier of rent. ↩
13. Blumenthal's report quotes extensively from the latter, and Blumenthal expressed that he would have not been surprised to learn that everything in his report concerning copiers was copied from DataPro. ↩
14. Accompanying his estimates of residual value is an "analysis" of future residual value determinations according to each type of machine. It is not explained in the report if this "analysis," which is unsupported by reference to any data, is consistent with Blumenthal's extrapolation technique. ↩
15. Cf. Torres v. Commissioner,88 T.C. 702, 718↩ (1987). 16. See Casebeer v. Commissioner,T.C. Memo. 1987-628↩. 17. In Moore v. Commissioner,T.C. Memo. 1987-626, a case involving a similar transaction, we stated that "we are convinced that the form of the transaction and the attendant inquiry demonstrated by petitioner belies a determination that petitioner manifested a business purpose." 54 T.C.M. at 1417, 56 P-H Memo T.C. par. 87,626 at 87-3400. 18. In Shriver v. Commissioner,T.C. Memo. 1987-627, we found that the taxpayer "did not manifest a subjective business purpose with respect to the investment. Petitioner relied solely on [the CPA advising him to enter the transaction] to determine the economic attractiveness of the transaction." We found that reliance to be insufficient to establish a business purpose. The difference between Shriver↩ and this case -- that Shriver's reliance was explicit while petitioner's was implicit -- is a distinction without a difference. 19. In this context we have recently held that investment credit is no a substitute for or a component of economic profit in an economic substance analysis. Friendship Dairies v. Commissioner,90 T.C. 1054↩ (1988). We assume that the investment credit was retained by Health-Chem pursuant to section 48(d). 20. This was approximately the discount applied to the two pieces of equipment which the parties were unable to describe or otherwise identify. ↩
21. A "standard end-user lease" in Torres↩ involved a rental of $ 1,250 per month, while end-user leases in this case typically involved rental of not over $ 200 per month. 22. The parties have assumed that petitioner's cash investment was limited to his 1.5 percent cash down payment and the amounts of the two recourse notes. Since Baker's attorney's fee was a part of petitioner's acquisition cost, it is properly added to his cash investment, and in a bona fide transaction, would be added to his basis in the equipment. 23. Torres↩ did not involve the use of nonrecourse debt only, as a 12 percent down payment was made on the equipment bought and leased in that transaction. 24. Ernstoff v. Commissioner,T.C. Memo. 1988-146↩. 25. There was no purchase option in this case. ↩
26. This opinion by Blumenthal, which we think is supported by common sense, was elicited at trial and was not contained in his report. ↩
27. In years. ↩
28. Neither party was able to describe or define the M500D and M900D. Blumenthal determined a residual value for these machines by using the average of all other equipment. ↩
29. The model S726 and S810 are made by Olivetti for the Sharp company and are sold under that name. The S726 and the C1550 are the same copier with different brand names. ↩