113 T.C. No. 13

UNITED STATES TAX COURT

THE LIMITED, INC., AND CONSOLIDATED SUBSIDIARIES, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 26618-95.          Filed September 7, 1999.

P's subsidiary, D, a domestic corporation, is a
credit card bank, issuing private label credit cards to
customers of P.  F1 is a controlled foreign corporation
with respect to P.  F2 is a foreign subsidiary of F1.
F1 funded F2, which purchased certificates of deposit
(CDs) from D.
     Held:  The CDs are U.S. property within the
meaning of sec. 956(b)(1), I.R.C., and not deposits
with persons carrying on the banking business within
the meaning of sec. 956(b)(2)(A), I.R.C.  Held,
further, the CDs are attributed to F1 pursuant to sec.
1.956-1T(b)(4), Temporary Income Tax Regs., 53 Fed.
Reg. 22163, 22165 (June 14, 1988).  Held, further, P
must include the increase of investment in U.S.
property in gross income pursuant to sec. 951(a)(1)(B),
I.R.C.

Joel V. Williamson, Roger J. Jones, Frederic L. Hahn, Daniel A. Dumezich, Russel R. Young, Neil B. Posner, James P. Fuller, Kenneth B. Clark, Ronald B. Schrotenboer, William F. Colgin, Jr., and Patricia A. Yurchak, for petitioner.

Kristine A. Roth, James E. Kagy, Donald K. Rogers, and John Budde, for respondent.

HALPERN, Judge:  Petitioner is the common parent corporation of an affiliated group of corporations making a consolidated return of income (the affiliated group).  By notice of deficiency dated September 29, 1995 (the notice), respondent determined deficiencies in Federal income tax for the affiliated group for its taxable years ended February 1, 1992, and January 30, 1993 (1992 and 1993, respectively), in the amounts of $72,040,547 and $95,836,934, respectively.  Many of the adjustments giving rise to the deficiencies determined in the notice have been settled, and this report addresses only whether certain transfers during 1993 were investments in U.S. property for purposes of those provisions of the Internal Revenue Code dealing with controlled foreign corporations.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue.

FINDINGS OF FACT

Introduction

Some of the facts have been stipulated and are so found. The stipulations of facts filed by the parties, with accompanying exhibits, are incorporated herein by this reference. Petitioner has its principal place of business in Columbus, Ohio.[1]

Business of Petitioner

Petitioner is one of the largest specialty retailers in the United States. During the years at issue, it sold its merchandise both in its own stores and by catalog. Among the well-known stores owned by petitioner were The Limited, Lane Bryant, Lerner New York, Victoria's Secret, and Abercrombie & Fitch. Petitioner earned its income primarily from the sale of garments. A foreign subsidiary of petitioner manufactured many of those garments or contracted with others for their manufacture.

Payments by Customers

Merchandise sold by petitioner is paid for with cash, by check, or by credit card. Petitioner accepts two types of credit cards: (1) petitioner's private-label credit card, which is honored only in one or more of petitioner's stores, and (2) a

---

[1] In the stipulations, the parties have adopted the convention of referring to the affiliated group as "petitioner"; hereafter, we will use the term "petitioner" to refer both to the affiliated group and to any member, so long as specific identification of that member is unnecessary.

credit card issued by a third-party bank or other financial institution and honored by many merchants.

Petitioner's Private-Label Credit Cards

Prior to 1982, petitioner issued no credit cards.

In 1982, petitioner acquired two retailers of women's clothing that had preexisting open-end credit plans: i.e., credit plans providing for repeated extensions of credit with no fixed dates for repayment. Petitioner organized two new subsidiary corporations to take over the operation of those credit plans. Those two corporations were Limited Credit Services, Inc. (Limited Credit), a Delaware corporation, and World Financial Network, Inc. (WFN), also a Delaware corporation. Limited Credit administered petitioner's open-end credit operations. WFN funded the consumer credit associated with the open-end credit systems through a receivables financing facility. Eventually, Limited Credit and WFN came to operate credit plans for some of petitioner's other stores.

The credit plans operated by Limited Credit were established under the retail installment sales acts enacted in each of the 50 States, the District of Columbia, and Puerto Rico. Limited Credit was required to comply on a State-by-State basis with varying limitations on interest rates, minimum finance charges, delinquency charges, uncollectible check fees and methods for calculating the average daily balance of accounts.

Organization of World Financial Network National Bank

In 1986, Ralph E. Spurgin (Spurgin) joined petitioner's organization and became president of Limited Credit. Spurgin believed that petitioner could increase the profitability of its credit card operations if it could avoid the various States' retail installment sales acts. In particular, he believed that, if petitioner could avoid setting interest rates on a State-by-State basis, and charge a uniform rate, it could earn an additional $10 million dollars in revenue. Spurgin believed that a way to avoid the States' retail installment sales acts was, in some manner, to employ a national bank to extend credit to customers of the stores (a bank that would not be subject to the various States' retail installment sales acts).[2]

The Bank Holding Company Act of 1956 (BHCA), ch. 240, 70 Stat. 133, currently codified at 12 U.S.C. secs. 1841-1850 (1994), concerns the ownership of banks. In general, BHCA prohibits companies that own banks from engaging in any business

---

[2] A national banking association is permitted to charge interest for any extension of credit at the rate permitted by the State in which it is located or, alternatively, a rate 1 percent greater than the 90-day discount rate in effect in the Federal Reserve district in which the national banking association is located, whichever is higher. 12 U.S.C. sec. 85 (1994), 12 C.F.R. sec. 7.4001 (1999); Marquette Natl. Bank v. First of Omaha Serv. Corp., 439 U.S. 299 (1978). Prior to the decision in Marquette, the majority of analysts assumed that a national bank was not permitted to export the interest rate permitted by the State in which it was located, but, rather, was subject to the usury restrictions imposed by each of the States in which its credit card customers resided.

other than banking or a business closely related to banking. See

12 U.S.C. sec. 1841 (1994). In 1987, in part to deal with the

problem of "nonbank banks" (institutions regulated as banks but

exempt from key provisions of BHCA because of their failure to

meet the definition of a bank under BHCA), Congress amended BHCA.

See the Competitive Equality Banking Act of 1987 (CEBA), Pub. L.

100-86, sec. 1004(b), 101 Stat. 552, 659.[3]  CEBA broadened the

---

[3]    S. Rept. 100-19 (1987) accompanied S. 790, 100th Cong. 1st
Sess. (1987), which, substantially as passed by the Senate,
became Pub. L. 100-86, 101 Stat. 552 (Competitive Equality
Banking Act of 1987 (CEBA), Pub. L. 100-86, 101 Stat. 552).  See
H. Conf. Rept. 100-261 (1987).  Immediately prior to CEBA, the
Bank Holding Company Act of 1956 (BHCA), ch. 240, 70 Stat. 133,
currently codified at 12 U.S.C. secs. 1841-1850 (1994), defined a
"bank" as an institution that both accepted demand deposits and
made commercial loans.  12 U.S.C. 1841(c)(1) and (2) (1982).  The
Senate Comm. on Banking, Housing, and Urban Affairs (the
Committee) believed that that definition created a loophole (the
"nonbank loophole") for a bank that refrained from one of those
two activities and, thus, was not considered a bank for purposes
of BHCA.  For instance, the Committee believed that a nonbank
bank could offer interest bearing NOW accounts rather than demand
deposits and escape regulation under BHCA.  S. Rept. 100-19,
supra at 5-6.  The Committee found:

> The impetus for nonbank banks stems primarily from
> large diversified companies wanting to invade the
> banking business while avoiding the regulatory
> restraints of the Bank Holding Company Act.  Thus some
> of the nation's largest retailing, securities, and
> insurance companies have been able to enter the banking
> business through the nonbank loophole while banks are
> prevented from entering those businesses by the Bank
> Holding Company Act.

Id. at 6.  The Committee believed that a failure to close the
nonbank loophole would cause a number of problems in the banking
system, including creating new competitive inequalities for bank
holding companies, whose activities, under BHCA, must be closely

(continued...)

definition of a bank for purposes of BHCA but excluded from that definition institutions engaging only in credit card transactions (credit card banks).[4]  Thus, a company like petitioner, which was engaged in neither banking nor a banking related business, could own a credit card bank without violating BHCA.  CEBA cleared the way for petitioner to own a bank that could charge a uniform rate of interest on credit card sales.[5]

As of March 15, 1989, World Financial Network National Bank (WFNNB) was organized under the National Bank Act, see 12 U.S.C.

---

[3](...continued)
related to banking.  Id. at 7-9.  To close the nonbank loophole, Congress expanded the definition of the term "bank" in BHCA to include any bank whose deposits are insured by the Federal Deposit Insurance Corp., as well as any institution that (1) accepts demand deposits or deposits that the depositor may withdraw by check or similar means for payment to third parties and (2) engages in the business of making commercial loans.  See 12 U.S.C. sec. 1841(c)(1) (1994), as amended by CEBA, sec. 101, 101 Stat. 554-557.  Congress maintained certain express exclusions from the definition of the term "bank" and provided certain, additional limited exceptions for, among other institutions, credit card banks.  See 12 U.S.C. sec. 1841(c)(2) (1994); S. Rept. 100-19 supra at 11.  An institution qualifies as a credit card bank if it (1) engages only in credit card operations, (2) does not accept demand deposits or deposits that the depositor may withdraw by check or similar means for payment to third parties or others, (3) does not accept any savings or time deposits of less than $100,000 (except for certain deposits held as collateral), (4) maintains only one office that accepts deposits, and (5) does not engage in the business of making commercial loans.  12 U.S.C. sec. 1841(c)(2)(F) (1994).

[4]    See supra note 3.

[5]    In 1986, Ralph E. Spurgin believed that the Comptroller of the Currency had put a moratorium on the organization of nonbank banks that would issue credit cards.

sec. 24 (1994). On May 1, 1989, the Comptroller of the Currency issued a charter certificate to WFNNB authorizing it to commence the business of banking as a National Banking Association. The articles of association of WFNNB (the articles) state that the association is organized to carry on the business of banking under the laws of the United States. The articles incorporate in full the CEBA credit card institution restrictions. See supra note 3. In pertinent part, Article THIRD provides:

The association

  (i)  will engage only in credit card operations;
 (ii)  will not accept demand deposits or deposits that the depositor may withdraw by check or similar means for payment to third parties or others;
(iii)  will not accept any savings or time deposit of less than $100,000;
 (iv)  will maintain no more than one office that accepts deposits;
  (v)  will not engage in the business of making commercial loans; * * *

Petitioner subscribed to 175,000 shares of the common stock of WFNNB (par value $17.5 million). In consideration of receipt of those shares, petitioner contributed all of the stock of Limited Credit and WFN to WFNNB, which corporations were thereafter liquidated and dissolved. WFNNB is a wholly owned subsidiary corporation of petitioner.

Credit Operations of World Financial Network National Bank

Upon receipt of its charter, WFNNB entered into agreements (the merchant agreements) with the stores. The merchant agreements concerned credit cards to be issued by WFNNB to customers of the stores and embodied the contractual relationship

between WFNNB and the stores with respect thereto.  Among other things, the merchant agreements entitled WFNNB to issue credit cards bearing the name and logo of each store to customers of that store.

Also upon receipt of its charter, WFNNB sent notices (change of terms notices) to holders of the credit cards previously issued under the credit plans operated by Limited Credit and WFN. The change of terms notices, among other things, informed such credit card holders that WFNNB would be the extender of credit on their account and, for credit card holders in certain States, there would be an increase in the interest rate on their accounts.

As of January 30, 1993, WFNNB had opened 12.9 million credit card accounts, and it had outstanding credit card loans in excess of $757 million.

WFNNB:  Capitalization and Liquidity Needs

WFNNB had cash (liquidity) needs that could not be met without borrowing.  Limited Service Corp. (Limited Service), another member of the affiliated group, performed the "treasury function" for WFNNB.  That function included assisting WFNNB in meeting its liquidity needs.  Limited Service had access to funds generated by petitioner's sale of its commercial paper. Initially, WFNNB's liquidity needs were met from within the

affiliated group.  On May 1, 1989, Limited Service granted WFNNB a line of credit in the amount of $500 million.  On December 1, 1993, Limited Service increased to $1 billion the line of credit it granted to WFNNB.  At various times, WFNNB obtained funds from Limited Service pursuant to various other long- and short-term loan agreements.  WFNNB also borrowed money from, and was granted lines of credit by, various unrelated, outside lenders. On December 4, 1992, WFNNB was granted a $280 million line of credit by a syndicate of 17 banks.  WFNNB never drew on that line of credit because it could obtain funds less expensively from Limited Service.

Certificates of Deposit

WFNNB first issued (sold) a certificate of deposit (CD) on May 1, 1989.  That CD was sold to Limited Service for $100,000, the minimum acceptable time deposit pursuant to the CEBA restrictions incorporated in the articles.

On November 19, 1992, by letter agreement (the letter agreement), WFNNB appointed Merrill, Lynch, Pierce, Fenner & Smith, Inc. (Merrill Lynch), as its agent for its customers who desired to purchase CDs.  The letter agreement provided that the CDs would be sold in denominations of $100,000 or integral multiples thereof.

During December 1992 and January 1993, WFNNB, acting through its agent, Merrill Lynch, sold 17 CDs, receiving $26.3

million.  Those 17 CDs comprised 263 "transferable individual time deposit accounts" of $100,000 each.  Each of those accounts was insured by the Federal Deposit Insurance Corp.

MFE (Netherlands Antilles) N.V. (MFE N.V.), is a Netherlands Antilles corporation.  On January 28, 1993, MFE N.V. purchased eight CDs from WFNNB in the total amount of $174.9 million (the MFE N.V. CDs).  Each MFE N.V. CD was for a term of 1 year, showed an annual interest rate of 3.1 percent (annual yield of 3.14 percent), and provided that it was a "non-negotiable and
non-transferable time deposit".  Each also provided:  "This Time Deposit shall renew automatically for a like term unless and until notice of withdrawal is presented at the Bank within * * * seven calendar days after the maturity date".

Reduction of Indebtedness to Limited Service

On January 28, 1993, WFNNB transferred the $174.9 million received from MFE N.V. on the sale of the CDs to Limited Service to reduce the balance outstanding under the line of credit extended to WFNNB by Limited Service.

Petitioner's Indirect Ownership of MFE N.V.

MFE N.V. is a fourth tier subsidiary of petitioner.  The relationship of MFE N.V. to petitioner, as well as the

relationship of WFNNB, Limited Service, and petitioner's stores to petitioner is shown in the following diagram.

## Simplified Corporation Organizational Structure
### January 1993



Organization and Operation of MFE and MFE N.V.

In 1970, Mast Industries, Inc. (MII) organized Mast Industries (Far East) Ltd. (MFE) as a Hong Kong corporation. At all times here pertinent, MFE had its headquarters and principal place of business in Hong Kong. MFE is a "controlled foreign corporation" (of petitioner) within the meaning of section 957(a).

MFE is a contract manufacturer for petitioner. It operates throughout Asia, manufacturing or contracting for the manufacture of garments to be sold by petitioner's stores.

MFE declared no significant dividends from the early 1980s through 1993, resulting in accumulated earnings and profits in excess of $330 million at the end of 1993.

On January 12, 1993, the directors of MFE resolved to organize and capitalize MFE N.V. Among the stated purposes were: "engaging in group financing activities and providing for a means of investing and reinvesting liquid assets and funds." The directors of MFE further resolved to make a capital contribution to MFE N.V. of $175 million. MFE N.V. had no employees during January 1993. On January 28, 1993, MFE transferred $175 million by wire to MFE N.V. That $175 million was used to purchase the MFE N.V. CDs.

OPINION

## I. Introduction

World Financial Network National Bank (WFNNB), a national banking association, is a wholly owned subsidiary of petitioner. In 1989, WFNNB was organized (and today operates) as a credit card bank to issue credit cards to customers of petitioner's stores. Mast Industries (Far East), Ltd. (MFE), a Hong Kong corporation, also is a wholly owned subsidiary of petitioner. MFE is a controlled foreign corporation within the meaning of section 957 and, with respect to MFE, petitioner is a U.S. shareholder within the meaning of section 951(b). MFE (Netherlands Antilles) N.V. (MFE N.V.), a Netherlands Antilles corporation, is a wholly owned subsidiary of MFE. On January 28, 1993, MFE N.V. purchased eight certificates of deposit (CDs) from WFNNB in the total amount of $174.9 million (the MFE N.V. CDs). We must determine whether, as a result of those purchases, petitioner must include $174,127,665 in gross income under section 951(a)(1)(B) on account of the investment by MFE of its earnings in U.S. property.[6] See sec. 956.

---

[6] The record does not explain the discrepancy between the $174.9 million purchase price and the $174,127,665 adjustment to gross income.

## II.  Internal Revenue Code and Regulations

The principal provisions of the Internal Revenue Code at issue are sections 951 and 956.  Sections 951 and 956 are found in subpart F of part III, subchapter N, chapter 1 of the Internal Revenue Code (subpart F).  Subpart F concerns itself with controlled foreign corporations.  The term "controlled foreign corporation" is defined in section 957(a).[7]  Section 951 provides that each U.S. shareholder of a controlled foreign corporation shall include in gross income certain amounts, including "his pro rata share (determined under section 956(a)(2)) of the corporation's increase in earnings invested in United States property".

In pertinent part, section 956 provides:

(a) General Rules.--For purposes of this subpart--

(1) Amount of investment.  The amount of earnings of a controlled foreign corporation invested in United States property at the

---

[7]   Sec. 957(a) provides:

General Rule.--For purposes of this subpart, the term "controlled foreign corporation" means any foreign corporation if more than 50 percent of--
(1) the total combined voting power of all classes of stock of such corporation entitled to vote, or
(2) the total value of the stock of such corporation,
is owned (within the meaning of section 958(a)), or is considered as owned by applying the rules of ownership of section 958(b), by United States shareholders on any day during the taxable year of such foreign corporation.

close of any taxable year is the aggregate amount of such property held, directly or indirectly, by the controlled foreign corporation at the close of the taxable year, to the extent such amount would have constituted a dividend (determined after the application of section 955(a)) if it had been distributed.

(2) Pro rata share of increase for year.
* * *

*     *     *     *     *     *     *

(b) United States property defined.--

(1) In general.--For purposes of subsection (a), the term "United States property" means any property acquired after December 31, 1962, which is--

(A) tangible property located in the United States;

(B) stock of a domestic corporation;

(C) an obligation of a United States person; or

(D) any right to the use in the United States of--

(i) a patent or copyright,

(ii) an invention, model, or design (whether or not patented),

(iii) a secret formula or process, or

(iv) any other similar right, which is acquired or developed by the controlled foreign corporation for use in the United States.

(2) Exceptions.--For purposes of subsection (a), the term "United States property" does not include--

(A) obligations of the United States, money, or deposits with persons carrying on the banking business;

(B) property located in the United States which is purchased in the United States for export to, or use in, foreign countries;

(C) any obligation of a United States person arising in connection with the sale or processing of property if the amount of such obligation outstanding at no time during the taxable year exceeds the amount which would be ordinary and necessary to carry on the trade or business of both the other party to the sale or processing transaction and the United States person had the sale or processing transaction been made between unrelated persons;

(D) any aircraft, railroad rolling stock, vessel, motor vehicle, or container used in the transportation of persons or property in foreign commerce and used predominantly outside the United States;

(E) an amount of assets of an insurance company equivalent to the unearned premiums or reserves ordinary and necessary for the proper conduct of its insurance business attributable to contracts which are not contracts described in section 953(a)(1);

(F) the stock or obligations of a domestic corporation which is neither a United States shareholder (as defined in section 951(b)) of the controlled foreign corporation, nor a domestic corporation, 25 percent or more of the total combined voting power of which, immediately after the acquisition of any stock in such domestic corporation by the controlled foreign corporation, is owned, or is considered as being owned, by such United States shareholders in the aggregate;

(G) any movable property (other than a vessel or aircraft) which is used for the purpose of exploring for, developing, removing, or transporting resources from ocean waters or under such waters when used

on the Continental Shelf of the United States;
[Emphasis added.]

In pertinent part, section 1.956-1T(b)(4), Temporary Income

Tax Regs. 53 Fed. Reg. 22163, 22165 (June 14, 1988), provides:

Treatment of certain investments of earnings in United
States property.  (i) Special Rule.  For purposes of
1.956-1(b)(1) of the regulations [which, as pertinent,
paraphrases section 956(a)(1)], a controlled foreign
corporation will be considered to hold indirectly * * *
at the discretion of the District Director, investments
in U.S. property acquired by any other foreign
corporation that is controlled by the controlled
foreign corporation, if one of the principal purposes
for creating, organizing, or funding (through capital
contributions or debt) such other foreign corporation
is to avoid the application of section 956 with respect
to the controlled foreign corporation.  * * *

III.  Summary of Arguments of the Parties

A.  Respondent's Arguments

MFE controls MFE N.V., and respondent argues that a

principal purpose for creating, organizing, or funding MFE N.V.

was to avoid the application of section 956.  Thus, respondent

would exercise his discretion to consider MFE as owning

(indirectly) any investment in U.S. property acquired by MFE N.V.

See sec. 1.956-1T(b)(4), Temporary Income Tax Regs.  Respondent

considers the MFE N.V. CDs to be U.S. property within the meaning

of section 956(b)(1)(C) (U.S. property).  Thus, respondent

concludes that (1) MFE, a controlled foreign corporation,

increased its earnings invested in U.S. property and

(2) petitioner, the sole U.S. shareholder of MFE, must include $174,127,665 in gross income pursuant to section 951(a)(1)(B).

Respondent has numerous arguments why the MFE N.V. CDs are not deposits with persons carrying on the banking business within the meaning of section 956(b)(2)(A) (sometimes, section 956 deposits).  Principally, respondent argues that (1) to be in the banking business for purposes of section 956(c)(2)(A), an institution must first be a "bank" within the meaning of section 581 (definition of bank for purposes of rules of general application to banking institutions), and (2) since WFNNB does no more than operate a private label credit card business, its activities are too narrow to put it into "the banking business". Respondent also argues that the MFE N.V. CDs did not constitute deposits as that term is used in section 956(b)(2)(A).

Alternatively, respondent argues that, because, in substance, the MFE NV CDs are the repatriation of earnings of a controlled foreign corporation, they should be treated as such no matter what steps petitioner took to color them as something else.

B.  Petitioner's Arguments

Petitioner denies that MFE N.V. was created, organized, or funded to avoid the application of section 956.  Moreover, petitioner argues that the MFE N.V. CDs do not constitute U.S. property since they qualify for an exception to that term as

"deposits with persons carrying on the banking business" pursuant to section 956(b)(2)(A). Petitioner argues that the term "the banking business" has no special meaning and that WFNNB was organized as a bank, is operated as a bank, is regulated as a bank, and is considered a bank by various experts in banking, finance, and economics. Petitioner likewise argues that the term "deposits" has no special meaning and the MFE N.V. CDs are deposits both in form and substance.

IV. Discussion

    A. Introduction

As will be explained below, the provisions of subpart F here in question were enacted to tax as dividends the repatriated earnings of controlled foreign corporations. An exception was made for deposits with persons carrying on the banking business. Given the limited purpose of WFNNB (to issue credit cards to customers of the stores), we find that the MFE N.V. CDs are not "deposits with persons carrying on the banking business", as Congress used those words in section 956(b)(2)(A). We independently reach the same conclusion based on the relationships between and among petitioner, WFNNB, MFE, and MFE N.V. Therefore, we find that the $174,127,665 in question was invested in U.S. property. The details of our reasoning are as follows.

B.  Deposits With Persons Carrying on the Banking Business

In arguing whether the MFE N.V. CDs constitute section 956 deposits, the parties expend considerable effort addressing whether WFNNB is a bank.  Respondent would have us define the term "bank" as it is defined in section 581, and argues that WFNNB cannot qualify under that definition since taking deposits from unrelated parties does not constitute a substantial part of its business.  Petitioner's argument is somewhat more elaborate. Petitioner argues that, since banks are in the business of banking, and WFNNB is a bank, WFNNB must be in the business of banking.  Petitioner supports its minor premise (WFNNB is a bank) by showing that WFNNB was organized to carry on the business of banking, is authorized by the Comptroller of the Currency to do business as a national banking association, and derives its authority from, and is governed by, the National Bank Act (currently codified in Title 12 U.S.C.).  Petitioner points out that WFNNB may not legally engage in any activity but the business of banking.  Petitioner concludes:  "The language enacted by Congress is unambiguous.  WFNNB is a bank.  It is therefore a priori engaged in the banking business.  As a matter of law, it can do nothing else."

We do not accept either party's argument that we can determine whether WFNNB is in the banking business simply by determining whether WFNNB is a bank.  The question is not whether

WFNNB is a bank.  Congress did not provide an exception for deposits with "banks"; it provided an exception for "deposits with persons carrying on the banking business".  Congress did not define the term "banking business", and, although petitioner presented expert testimony with respect to banks and banking, none of petitioner's experts claim that the term "banking business" is a term of art or has a well-defined meaning.  Indeed, petitioner's expert, Robert L. Clarke, Comptroller of the Currency from December 1985 through February 1992, testified: "During the time I served as Comptroller of the Currency, the issues of what it means to be a 'bank' and exactly what constitutes the 'banking business' regularly confronted the Office of the Comptroller of the Currency ('OCC'), Congress and the court system, including the Supreme Court."  We conclude that the term "deposits with persons carrying on the banking business" is ambiguous.[8]  Cf. NationsBank, N.A. v. Variable Annuity Life Ins. Co., 513 U.S. 251, 258, n.2 (1995) (determining that Comptroller of the Currency may determine what is an "incidental powe[r] * * * necessary to carry on the business of banking" for purposes of 12 U.S.C. sec. 24:  "We expressly hold the 'business of banking' is not limited to the enumerated powers in § 24

---

[8]    The parties dispute not only the meaning of the term "deposits with persons carrying on the banking business" but also the meanings of the subordinate terms "deposits" and "banking business".  We conclude that the subordinate term "banking business" is ambiguous.  That is sufficient for us to conclude that the superior term, "deposits with persons carrying on the banking business", is ambiguous.

Seventh and that the Comptroller therefore has discretion to authorize activities beyond those specifically enumerated.")

C. <u>Court's Function in Interpreting the Internal Revenue Code</u>

This Court's function in interpreting the Internal Revenue Code is to construe the statutory language to effectuate the intent of Congress. See <u>United States v. Am. Trucking Associations</u>, 310 U.S. 534, 542 (1940); <u>Merkel v. Commissioner</u>, 109 T.C. 463, 468 (1997); <u>Fehlhaber v. Commissioner</u>, 94 T.C. 863, 865, affd. 954 F.2d 653 (11th Cir. 1992); <u>U.S. Padding Corp. v. Commissioner</u>, 88 T.C. 177, 184, (1987), affd. 865 F.2d 750 (6th Cir. 1989). Both a textual analysis of the statute and a consideration of Congress' purpose in enacting Subpart F are warranted and appropriate to determine whether deposits with WFNNB, whose activities were predominantly limited to credit card transactions, and which is a wholly owned subsidiary of petitioner, are section 956 deposits. See <u>Public Citizen v. United States Dept. of Justice</u>, 491 U.S. 440 (1989). We begin by considering Congress' purpose in enacting subpart F.

D. <u>Tax Reform Acts of 1962 and 1976</u>

Subpart F was added to the Internal Revenue Code of 1954 by section 12 of the Revenue Act of 1962, Pub. L. 87-834, 76 Stat. 960. H.R. 10650, 87th Cong., 2d Sess. (1962) (H.R. 10650), is the bill that, when enacted, became the Revenue Act of 1962. The committee reports accompanying H.R. 10650, both in the House of

Representatives (the House) and in the Senate, discuss the impetus for subpart F: to wit, to end the "tax deferral" resulting from the failure of our income tax system to tax the foreign source income of American controlled foreign corporations until such income is distributed to the corporation's American shareholders as dividends. H. Rept. 1447, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 405, 461; S. Rept. 1881, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 707, 784. The committees did not attempt to eliminate such tax deferral completely, but they did address certain "tax haven" devices. See S. Rept. 1881, supra, 1962-3 C.B. at 784. With respect to that portion of subpart F dealing with investments in U.S. property (the repatriation provision), the Committee on Finance said: "Generally, earnings brought back to the United States are taxed to the shareholders on the grounds that this is substantially the equivalent of a dividend being paid to them." S. Rept. 1881, supra, 1962-3 C.B. at 794. Accord H. Rept. 1447, supra, 1962-3 C.B. at 469. With respect to the exceptions to U.S. property for section 956 deposits (which both tax writing committees referred to as "bank accounts") and the other items contained in section 956(b)(2), the Committee on Finance explained: "The exceptions * * * however, are believed to be normal commercial transactions without intention to permit the funds to remain in the United States indefinitely (except in the case of the last category where full U.S. corporate tax is

being paid)."[9]  S. Rept. 1881, supra, 1962-3 C.B. at 794; accord

H. Rept. 1447, supra, 1962-3 C.B. at 469.

Because U.S. property was defined to include, in general,

all tangible and intangible property located in the United

States, the scope of the repatriation provision proved too broad

for Congress, which, in 1976, limited it.  See Tax Reform Act of

1976, Pub. L. 94-455, sec. 1021(a), 90 Stat. 1525 (adding section

956(b)(2)(F) and (G)).  H.R. 10612, 94th Cong., 2d Sess. (1975),

is the bill that, when enacted, became the Tax Reform Act of

1976.  The committee reports accompanying H.R. 10612, both in the

House and the Senate, state the committees' views that the scope

of the repatriation provision is too broad.  H. Rept. 94-658

(1975), 1976-3 C.B. (Vol. 2) 701, 908; S. Rept. 94-938 (1976),

1976-3 C.B. (Vol. 3) 57, 226.  Both reports state that the

repatriation provision may have encouraged foreign corporations

to invest their profits abroad, with a detrimental effect upon

the U.S. balance of trade:  "For example, a controlled foreign

corporation looking for a temporary investment for its working

capital is, by this provision, induced to purchase foreign rather

---

[9]    As originally enacted, sec. 956(b)(2) contained only the
exceptions set out as secs. 956(b)(2)(A) through (E) plus an
exception for assets of the controlled foreign corporation equal
to certain accumulated earnings and profits already subject to
income taxation in the United States (i.e., the "last category"
referred to in the quoted language from the report of the
Committee on Finance).  The exception set out as sec.
956(b)(2)(F) was added by the Tax Reform Act of 1976, Pub. L. 94-
455, sec. 1021(a), 90 Stat. 1520.

than U.S. obligations." H. Rept. 94-658, supra, 1976-3 C.B. (Vol.2) at 908; S. Rept. 94-938, supra, 1976-3 C.B. (Vol. 3) at 226.

The Committee on Finance explained:

In the committee's view a provision which acts to encourage, rather than prevent, the accumulation of funds offshore should be altered to minimize any harmful balance of payments impact while not permitting the U.S. shareholders to use the earnings of controlled foreign corporations without payment of tax.
In the committee's view, since the investment by a controlled foreign corporation in the stock or debt obligations of a related U.S. person or its domestic affiliates makes funds available for use by the U.S. shareholders, it constitutes an effective repatriation of earnings which should be taxed. The classification of other investments in stock or debt of domestic corporations as the equivalent of dividends is, in the committee's view, detrimental to the promotion of investments in the United States. Accordingly, the committee's amendment provides that an investment in U.S. property does not result when the controlled foreign corporation invests in the stock or obligations of unrelated U.S. persons.

S. Rept. 94-938, supra, 1976-3 C.B. (Vol. 3) at 226; see also, H. Rept. 94-658, supra, 1976-3 C.B. (Vol. 2) at 908. By the Tax Reform Act of 1976, Congress added subparagraph (F) to section 956(b)(2).[10] Subparagraph (F) of section 956(b)(2) provides that U.S. property does not include stock or debt of a domestic corporation (unless the corporation is itself a U.S. shareholder of the foreign controlled corporation) if the U.S. shareholders

---

[10] Congress also added subparagraph (G) to sec. 956(b)(2), which deals with certain oil drilling rigs used on the U.S. continental shelf and is not relevant to our discussion.

of the controlled foreign corporation have less than 25-percent control of the domestic corporation.

    E.  <u>Analysis</u>

       1.  <u>The Banking Business</u>

The repatriation provision was enacted in 1962 on the theory that the repatriation of previously untaxed (by the United States) earnings by a controlled foreign corporation was substantially the equivalent of a dividend being paid to the U.S. shareholders of that corporation (dividend equivalency theory). Excepted were a group of transactions that the tax writing committees believed were "normal commercial transactions without intention to permit funds to remain in the United States indefinitely".  S. Rept. 1881, <u>supra</u>, 1962-3 C.B. at 794; accord H. Rept. 1447, <u>supra</u>, 1962-3 C.B. at 469.  One such exception is for "deposits with persons carrying on the banking business". The phrase "carrying on the banking business" is a phrase modifying (and, thus, describing or limiting) the noun "persons". The phrase expresses an action required of such persons.  That action is to carry on "the banking business".  Congress' use of the definite article "the" to modify the subordinate term "banking business" indicates a purpose to particularize the activity or activities required of such persons.  Such persons must do something in particular:  They must carry on (i.e., conduct) a business.  Not any business, but <u>the</u> banking business; not <u>a</u> banking business (which would suggest a variety of

businesses that would qualify) but the banking business.  Our textual analysis convinces us that Congress did not intend that the term "persons carrying on the banking business" apply to every person that is conducting one or more of the activities that are considered to be part of a banking business by any statute, agency, or industry.  Therefore it is not sufficient for petitioner to prove that the activities and business that WFNNB carried on were a banking business.  Rather, the issue is whether WFNNB was "carrying on the banking business", as those terms are used in section 956(b)(2)(A).  (Emphasis added.)

From the context of the term "the banking business" we infer that Congress meant a group of activities carried on to aid the domestic business activities of controlled foreign corporations. For example, section 956(b)(2)(B) and (C) except, from the definition of U.S. property, property that is purchased for export and loans to U.S. sellers or processors of the controlled foreign corporation's property.  We believe that a person carrying on the banking business, for purposes of section 956(b)(2)(A), must, at the very least, provide banking services useful to a controlled corporation engaging in business activities in the United States.  Our conclusion that Congress had a group of business-facilitating activities in mind is bolstered by the tax writing committees' stated belief that the exceptions to the definition of U.S. property were for "normal commercial transactions without intent to permit the funds to

remain in the United States indefinitely". Both tax writing committees used the term "bank accounts" to describe the deposits exception. A dictionary definition of the term "bank account" is: "an account with a bank created by the deposit of money or its equivalent and subject to withdrawal of money (as by check or passbook)". Webster's 3d New International Dictionary 172 (1993) (similar in second edition, 1934). While not dispositive of Congressional intent, the use of the term "bank accounts", as defined in the dictionary for many years, is yet another indication that the deposit exception was meant to encompass banking functions (e.g., the ability to write checks) that would facilitate the controlled foreign corporation's business.

In H. Rept. 1447, the Committee on Ways and Means reported: "Certain exceptions * * * [to the House's definition of U.S. property] are made but these apply only where the property located within the United States is ordinary and necessary to the active conduct of the foreign corporation's business or substantially the same trade or business". H. Rept. 1447, supra, 1962-3 C.B. at 469 (emphasis added). H.R. 10650 as passed by the House (the House bill) dealt more strictly with a controlled foreign corporation's investment of its earnings than did the provision substituted by the Senate (which substitute was accepted by the House). To escape tax, the House bill would have required earnings invested outside of the United States (and the few exceptions for domestic investments) to be invested in money

or property "ordinary and necessary for the active conduct of a qualified trade or business" (the active conduct restriction). H.R. 10650, 87th Cong., 2d Sess., sec. 13(a) (1962). The Senate eliminated that restriction. It retained virtually unchanged, however, the language of the House bill describing the few permitted domestic investments. Since the House undoubtedly understood that language to describe investments satisfying the active conduct restriction, it can be inferred by the Senate's nearly verbatim adoption of the same language that it also understood that language to describe investments satisfying the active conduct restriction, notwithstanding its elimination of that restriction with respect to all foreign investments and U.S. investments of earnings that had been subjected to U.S. taxation.

We are mindful that the exceptions to the definition of U.S. property provided in section 956(b)(2)(A) include an exception for "obligations of the United States", which, of course, could include a long-term investment, such as a 30-year Treasury bond. This fact does not alter our conclusion that Congress intended to limit section 956(b)(2)(A), in general, and the section 956 deposit exception, in particular, to business facilitating activities. It was only natural for Congress to encourage any form of deposit of offshore earnings with the U.S. Government.

Given our conclusion as to the meaning of the term "the banking business", we are satisfied that the activities of WFNNB

do not satisfy it.  WFNNB's articles of association significantly limit its banking activities:

> The association
>  (i)  will engage only in credit card operations;
>  (ii)  will not accept demand deposits or deposits that the depositor may withdraw by check or similar means for payment to third parties or others;
>  (iii)  will not accept any savings or time deposit of less than $100,000;
>  (iv)  will maintain no more than one office that accepts deposits;
>  (v)  will not engage in the business of making commercial loans; * * *

WFNNB is a special purpose institution that is not of much use to a foreign business customer seeking banking services except as the issuer of a private-label credit card or as the recipient of large deposits of funds that are not needed immediately.  Those are insufficient services for us to conclude that WFNNB was "carrying on the banking business" as Congress used that phrase in section 956(b)(2)(A).

## 2.  Dividend Equivalence

As originally enacted, in 1962, the repatriation provision classified as U.S. property virtually all investments by a controlled foreign corporation of its earnings in the United States.  There was little, if any, reason for Congress to include a related-party restriction in the exception for section 956 deposits.[11]  By 1976, however, the tax writing committees of

---

[11]   From the enactment of the Bank Holding Company Act of 1956 (BHCA), Pub. L. 91-607, ch. 240, 70 Stat. 133, currently codified at 12 U.S.C. secs. 1841-1850 (1994), until its amendment by the
(continued...)

Congress had recognized that the repatriation provisions had discouraged investments that would be favorable to the U.S. balance of payments. Congress addressed that problem by adding two additional exceptions to the definition of U.S. property: subparagraphs (F) (certain stock or debt investments) and (G) (certain oil drilling rigs). The subparagraph (F) exception is limited to stock or debt of <u>unrelated</u> domestic corporations. The Committee on Finance cautioned that it did not wish the law to be changed to permit the U.S. shareholders of a controlled foreign corporation to use the earnings of the corporation without payment of tax. H. Rept. 94-658, <u>supra</u>. S. Rept. 94-938, <u>supra</u>. Congress did not amend the section 956 deposit exception to except only deposits with unrelated persons. That is understandable, however, since BHCA prohibited nonbank holding

---

[11](...continued)
Bank Holding Company Act Amendments of 1970 (BHCA 1970 Amendments), Pub. L. 91-607, 84 Stat. 1760, a bank holding company was defined as a company having control over two or more banks. The BHCA would, thus, not have impeded a nonbanking company, such as petitioner, from owning a single bank. Nevertheless, petitioner has failed to show us that, in 1962 (when subpart F was enacted), that possibility was any more than theoretical. See S. Rept. 91-1084 (1970), 1970 U.S.C.C.A.N., p. 5519, 5522 (accompanying H.R. 6778, which was enacted as BHCA 1970 Amendments, and describing "the theoretical freedom of a one-bank holding company to engage in any business, or acquire anything it desires (subject to antitrust laws)"; Conf. Rept. 91-1747 (1970), 1970 U.S.C.C.A.N., p. 5561, 5562 (also accompanying H.R. 6778 and stating that, "[i]n the late 1960's", nonbank corporations began acquiring one bank, "thus mixing banking and nonbanking in complete contravention of the purpose of both Federal banking laws going back to the 1930's and the Bank Holding Company Act of 1956.")

companies from owning banks.[12]  Petitioner has offered no policy
reason why Congress would permit deposits (particularly deposits
for an indefinite period) with a related bank but prohibit
investments in a related corporation.  In response to
petitioner's argument that the phrase "deposits with persons
carrying on the banking business" has a plain meaning (an
argument we reject), we note that, when the adherence to the
"plain meaning" of a statute produces an unreasonable result
"plainly at variance with the policy of the legislation as a
whole", it is proper to follow that purpose, rather than the
literal words.  United States v. Am. Trucking Associations, Inc.,
310 U.S. 534, 543-544 (1940)(internal quotation omitted); see
also United States v. Ron Pair Enter., 489 U.S. 235, 242 (1989).
Further, "[w]e may then look to the reason of the enactment and
inquire into its antecedent history and give it effect in
accordance with its decision and purpose, sacrificing, if
necessary, the literal meaning in order that the purpose may not
fail." U.S. Padding Corp. v. Commissioner, 88 T.C. 177, 184
(1987), affd. 865 F.2d 750 (6th Cir. 1989).  We believe that a
related party prohibition is implicit in the exception for
section 956 deposits.  Such a prohibition is necessary to give

---

[12]     Undoubtedly, Congress believed that it had foreclosed that
possibility in 1970 when it enacted BHCA 1970 Amendments.  See
supra note 11.  By 1987, nonbank companies had found a loophole
(the nonbank loophole) in BHCA, which Congress enacted CEBA to
close.  See supra note 3.  Commercial firms, however, did not
begin to exploit the nonbank loophole until the early 1980s.

effect to the dividend equivalence theory that underlies the repatriation provision.[13] If we find that the purchase of the MFE N.V. CDs amounts to the use of the earnings of a controlled corporation by a U.S. shareholder, we believe that such purchase must be regarded as an increase of earnings invested in U.S. property (and not a section 956 deposit).

On January 28, 1993, MFE N.V. purchased the (eight) MFE N.V. CDs from WFNNB for $174.9 million, Each CD was for a term of 1 year, showed an annual interest rate of 3.1 percent, and provided that it was a "nonnegotiable and nontransferable time

---

[13] Petitioner argues that a limitation of the sec. 956 deposits exception to unrelated-party deposits would render that exception "superfluous" in light of sec. 956(b)(2)(F). According to petitioner, because sec. 956(b)(2)(F) permits a controlled foreign corporation's earnings to escape U.S. taxation when invested in the obligations of an unrelated U.S. corporation, it would serve no purpose to interpret the sec. 956 deposits exception as accomplishing the same result with respect to obligations in the form of deposits with a domestic corporation carrying on the banking business. The sec. 956(b)(2)(A) exception, however, applies to "deposits with persons carrying on the banking business", whereas the sec. 956(b)(2)(F) exception applies to "obligations of a domestic corporation." A person carrying on the banking business need not be a corporation. See, e.g., Mass. Gen. Laws Ann. ch. 167, sec. 1 (1997) defining "Bank" to include "any individuals, association, partnership or corporation * * * doing a banking business in the commonwealth"; see also N.D. Cent. Code sec. 6-01-02 (1995) defining the terms "banking association" and "state banking association" to include "limited liability companies, partnerships, firms, or associations whose business in whole or in part consists of the taking of money on deposit". Although our interpretation of the sec. 956 deposits exception narrows its scope, we conclude that it cannot be interpreted to permit deposits by controlled foreign corporations with a related person carrying on the banking business to go untaxed and still remain consistent with the clear overall legislative intent to tax investments in related U.S. persons.

deposit".  Each also provided:  "This Time Deposit shall renew automatically for a like term unless and until notice of withdrawal is presented at the Bank within * * * seven calendar days after the maturity date".  On January 28, 1993, WFNNB transferred the $174.9 million received from MFE N.V. to Limited Services to reduce the balance outstanding under a line of credit extended to WFNNB by Limited Services.

WFNNB is a wholly owned subsidiary of petitioner, and, therefore, the reduction of WFNNB's line of credit balance to Limited Service directly benefited petitioner.  As we shall explain in the next section of this report, we find that respondent did not abuse his discretion in attributing the MFE N.V. CDs to MFE.  We therefore view the purchase of the MFE N.V. CDs as a repatriation of the earnings of MFE.  Because that repatriation made the earnings of MFE (a controlled foreign corporation) available for use by its only U.S. shareholder (petitioner), we find that the repatriation was substantially the equivalent of a dividend being paid by MFE to petitioner.  The purchase of the MFE N.V. CDs was an investment in U.S. property. The exception for section 956 deposits is unavailable.

F.  Section 1.956-1T(b)(4), Temporary Income Tax Regs.

Section 1.956-1T(b)(4), Temporary Income Tax Regs., 53 Fed. Reg. 22165 (June 14, 1988), empowers respondent to attribute to MFE the MFE N.V. CDs if one of the principal purposes for

creating, organizing, or funding MFE N.V. was to avoid the application of section 956 with respect to MFE.

Petitioner argues that the purpose of organizing MFE N.V. was to inject an additional corporate layer between MFE and the deposits to WFNNB "to improve the efficacy of the deposits as protection against expropriation" by the People's Republic of China, which was scheduled to take over Hong Kong in 1997. That was the testimony of Kenneth B. Gilman, petitioner's executive vice president-finance and chief financial officer. When asked, however, why that was the case, Mr. Gilman replied that he was not exactly sure. Timothy B. Lyons is and, during the years in issue, was petitioner's vice president-tax. His responsibilities include compliance, tax planning, and administration of the tax function at petitioner. He is intimately familiar with the business activity of MFE. Like Mr. Gilman, he also testified that the purpose of forming MFE N.V. was to protect against expropriation. Indeed, he testified that it was the "sole" purpose for organizing MFE N.V. On cross-examination, Mr. Lyon was asked why no consideration had been given to forming a domestic (United States) subsidiary of MFE to protect against expropriation. He responded: "It didn't really accomplish anything from the asset protection side * * * but * * * there is no question it would have been deemed a dividend or something at

that point."[14]  Further, petitioner decided to invest MFE's funds in WFNNB before MFE N.V. was organized.  Whether MFE N.V. was organized for asset protection purposes we need not say.  We do believe, however, that that was not the sole purpose of organizing MFE N.V.  We believe that a principal purpose of organizing and funding MFE N.V. was to avoid having the $174.9 million capital contribution result in subpart F income pursuant to section 956.  Further, we believe that another principal purpose was to limit any subpart F income imposed pursuant to section 956 to MFE N.V.'s earnings and profits, which were negligible.  Thus, we find that a principal purpose for creating, organizing, and funding MFE N.V. to purchase the MFE N.V. CDs, rather than using a domestic corporation or having MFE purchase the CDs directly, was to avoid the application of section 956.  Mr. Lyon's testimony supports that conclusion.  Accordingly, the MFE N.V. CDs are attributed to MFE pursuant to section 1.956-1T(b)(4), Temporary Income Tax Regs., supra.

G.  Conclusions

At the close of 1993, MFE held the MFE N.V. CDs.  The MFE N.V. CDs were U.S. property and not section 956 deposits.

---

[14]  It is possible that Mr. Lyon's concern related to sec. 956(b)(1)(B), pursuant to which MFE's increase in earnings invested in the stock of a domestic corporation would have resulted in subpart F income to petitioner to the extent of such increase.

## V.   Conclusion

To the extent respondent determined a deficiency in tax on the basis that petitioner must include $174,127,665 in gross income under section 951(a)(1)(B), that deficiency in tax is sustained.

An appropriate order

will be issued.